ALBANY,
Oct. 1837.

The People
v.
Albany Common Pleas.

---

THE PEOPLE *ex. rel.* EDWARD LIVINGSTON, *vs.* ALBANY COMMON PLEAS.

*District attorneys* can be legally appointed, only when the *court of common pleas* and the *court of general sessions* of the county for which the appointment is made, are both holden for the transaction of business.

The appointment, however, can be made only when the *county courts* are holden *by those judges of the courts*, who receive their commissions from the senate, on the nomination of the governor, and who held their offices for the term of five years; *justices of the peace*, or other officers who may be associated with the *judges* in holding a court of *general sessions*, have no right to participate in the exercise of the power of appointment.

APPOINTMENT of district attorneys. This was a motion for a *mandamus* to the Albany common pleas, to vacate the appointment made by that court on the 8th April, 1837, of Samuel Cheever, as district attorney of the county of Albany. The motion was brought on upon notice. The facts passed upon by the court are detailed in the opinion delivered by the chief justice. The motion was argued by

Oct. 1837.

*D. Burwell & M. T. Reynolds* for the relator.

*S. Stevens,* contra.

*By the Court,* NELSON, Ch. J. On the 30th March, 1837, the court of common pleas of Albany county directed to be entered in their minutes the following order: "Edward Livingston having resigned the office of district attorney of the county of Albany, to take effect on the second Tuesday of June next, *ordered,* that his resignation of that office be accepted to take effect at that time." And on the 8th April

---

* *Vide Hayward* v. *Hoyt,* 9 Wendell, 483.

following, directed the following order to be entered : The office of, the present district attorney expiring on the first day of the next term, and it being necessary for the proper prosecution of the public business that an appointment should be made at this term, it is hereby *ordered*, that Samuel Cheever be and he. is hereby appointed district attorney of the county of Albany, to take effect on the second Tuesday of June next.". Mr. Livingston now insists that the court of common pleas misapprehended some observations which he made at the opening of the court in March, and erroneously construed the intimation of an intention to resign his office at the beginning of the succeeding term, into an actual resignation to take effect at that time ; and on their refusal to vacate the above rules, he has applied for an alternative mandamus to compel them to do so, upon the grounds thus stated by him. He further insists, independently of the above view, that the appointment of Mr. Cheever being made by the *court of common pleas after the final adjournment for the term of the court of general sessions*, such appointment was made without proper constitutional authority, and is therefore void.

Whether Mr. Livingston actually resigned the office, to take effect at a future time, or simply intimated an intention to resign, is a question of fact, in respect to which we have before us several conflicting affidavits ; the distinction between the two versions as given of what was said, is not marked or very striking; and unless great pains were taken to discriminate by the use of precise and accurate terms, it is not surprising that even intelligent and respectable men should differ about their import. There is no principle involved in the consideration of the question, and the decision of it can have no important or decisive bearing upon the rights of the relator, let it be decided either way ; I shall, therefore, not stop to examine or weigh the facts in the affidavits. " The county courts," by the constitution, can remove these officers without cause ; and a controversy with them upon the question whether a resignation actually preceded the appointment of a successor or not, must of course in most cases be unprofitable. For the like reasons it will

also be unimportant to inquire whether the resignation should have been *in writing* to be effectual. Though we are free to say, that in our individual opinion there is nothing in the tenure of the office which upon general principles would require a written instrument *to work a valid surrender of it*; and there is nothing in the constitution or statute law on the subject. The latter regulates resignations in respect to the body or officer to whom they shall be made; but is silent as to the mode. 1 R. S. 121, § 33. Besides, the alleged resignation of Mr. Livingston and appointment of a successor, involves a constitutional question, which it is necessary to consider, and a decision of which, upon the view we have taken of it, will effectually dispose of the case, together with all its minor and collateral questions.

The constitution of this state, art. 4, § 9, ordains, that "the clerks of courts, &c. shall be appointed by the courts of which they respectively are clerks; *and district attorneys by the county courts.*" The question presented in the case is to what court or courts does this provision of the constitution refer? Is it to the common pleas, to the general sessions of the peace, or to both? The statute, 1 R. S. 122, § 33, sub. 5, provides that the resignation of district attorneys shall be made "to the court which appointed them;" so that the question becomes material as well in respect to the resignation as the appointment. As originally reported and adopted by the convention, the clause in the constitution read as follows; "District attorneys by the *courts of common pleas.*" It was subsequently altered by the committee to whom was referred the new provisions complete, to be properly incorporated with those of the old constitution which had been untouched, by substituting the term *county courts* for *courts of common pleas.* The counsel for Mr. Cheever contends that the change of language did not alter the meaning.

No courts have been erected in this state, or ever existed under the colonial regulations, by the *name* given in the constitution, except a sheriff's court, which could not have been intended. It would seem, therefore, to have been used with reference to no particular court existing at the

time; for if so, the statute name thereof would naturally have been retained or adopted; but rather with reference to one or more courts in the counties which from their jurisdiction, business, local organization and character, might be thus sufficiently described and known, to any or all which could be properly and legally applied the name of *county courts*, within the reasonable construction of that term. A very brief recurrence to the history of our town and county courts, will help to illustrate the truth and force of these remarks.

The first colonial governor, (R. Nicolls,) who took possession of the government in 1664, under the authority of the Duke of York, upon the surrender of the province by the Dutch, and held the *same* about three years, erected no courts of justice; but assumed upon himself the decision of all controversies. His successor [Gov. Lovelace, 1667,] called to his assistance justices of the peace, and constituted a court *called the* assizes, which exercised jurisdiction both at law and in equity. Subordinate to this were town courts and sessions of limited powers. In 1683, during the administration of Governor Dongan, the province was divided into twelve counties, and high sheriffs were appointed in each, with a view to the establishment of courts and the better government of the colony. An act was passed at the same time entitled "an act to settle courts of justice," and which provided, 1. That a court should be held monthly in each town throughout the year for the trial of "small causes and cases of debt and trespass, to the value of forty shillings or under," and which were to be heard and determined by three commissioners without a jury. 2. That there should be held *within every county in the province, a court of sessions* once a year, for hearing and determining "as well cases and causes criminal, as cases and causes civil;" that the judges of the respective sessions be composed of the justices of the peace, three or more of them, and all causes to be tried by the "verdict of twelve men of the neighborhood;" each court to have a clerk to "draw, enter and keep the records of indictments, informations, declarations, pleas, judgments, &c. All process to be

issued by the clerk, and executed by the sheriff. The act also fixed the times and places for holding the courts in the respective counties. A court of oyer and terminer and general jail delivery was also instituted at the same time, which had general jurisdiction, both civil and criminal, together with a supervisory or appellate power over the inferior judicatories. This arrangement of the courts continued from 1683 to 1691, at which time an act was passed establishing a court of common pleas, to be held in each county at the times and places where the general sessions were held ; one judge and three justices to be commissioned in each county to hold said court ; and to have jurisdiction in all actions and matters triable at common law, with the right of removal, in certain cases, to the supreme court, which was then by the same act first erected in the colony. See also an ordinance of the governor and council in 1699, during the administration of the Earl of Belmont, which has usually been referred to as the foundation of these courts. This organization of the county courts, except as to the civil jurisdiction of the general sessions, continued down to the adoption of the constitution, in 1821. It therefore appears as before stated, that there never has been any one court in the counties bearing the appellation given in the constitution ; but on the contrary, since 1691, there have been in the several counties two, which by way of general description and with strict propriety, may be denominated county courts ; the one for the purpose of hearing and determining the criminal business : the other the civil business of the county ; the criminal court being the oldest, and originally possessing to a certain extent the jurisdiction of both. °

The appellation " county courts," was probably taken from the constitution of 1777, having been used there in three instances. The 24th section provided that the "*first judge of the county court*," &c. should hold his office during good behavior, &c. Section 25th, that the first judges of *county courts* should not at the same time hold any other office. And section 28th, that new commissions should issue to *judges of county courts*, &c. once in three years.

ALBANY,
Oct. 1837.

The People
v.
Albany C. P.

ALBANY,
Oct. 1837.

The People
v.
Albany C. P.

Before and at the time of the adoption of the constitution of 1777, the judges of the counties sat both in the courts of common pleas and general sessions, by virtue of their commissions or otherwise. I have not found any statute authorizing them to hold the *sessions*, though there may have been one; but an examination of the minutes of this court in the county of Albany, for some twenty years previous to 1777, shows that in practice they held both courts. And this I think explains the phraseology, namely, *judges of the county court or courts*, used in the constitution of 1777; it was to express the fact as it then existed, namely, that they were judges of all, or both the county courts; because, if any particular court had been named, the term might have impliedly prohibited them from holding or assisting to hold any other than the one bearing that name. The term judges of common pleas, excluding these officers from the court of sessions, and *vice versa*. The language used in the constitution of 1777, was most appropriate to accomplish the purpose which we suppose was intended; and the authority of the judges to hold both courts has been since continued down to, and existed by virtue of a statute regulation, at the time of the adoption of the *new constitution*. The obscurity of the clause in question in this instrument arises out of the fact, that certain powers have been conferred upon the *county courts*, (not upon the *judges* of the county courts,) assumed to be then in existence, but which were unknown to the law by that name; and these powers must be executed, if at all, by considering them vested in some courts in the counties bearing other and distinct names in the statute law, as well as in their process, pleadings and practice; and which names they have borne since their erection. We are obliged to take the description thus given in the constitution, and to look into the organization of these courts in the counties, in order to ascertain those intended to be referred to; and in our examinations we find two equally corresponding with it; the one of civil, and the other criminal jurisdiction. According to the legislative contruction of the clause, the power is conferred upon "the *judges* of the county courts," 1 R. S. 108, § 15, which, if the true inter-

pretation, would avoid all difficulty; but it is, I apprehend, clearly a misreading, and cannot be maintained. The power is thrown upon the *courts*, not upon the *judges;* they are a different body, and would be obliged to act upon different principles. If thrown upon them, then all of them, the five judges, must meet and consult, though a majority may make the appointment. This is the common law rule where an authority is confided to a given number of persons or officers, and is now statute law. 2 R. S. 555, § 27. The appointment would not be the act of the *courts*, but of the *judges*, and might be made *in vacation* as well as *in term.*

The powers being thus conferred upon the *county courts* in general terms, studiously avoiding the particular and well known names of any of those previously established and then existing in the several counties ; names given in the statute, whereby they were first instituted, and by which they have ever since been known to the law, it seems difficult, if not impossible, to hold that the *courts of common pleas only* were intended; especially, when we remember that the designation of those courts was stricken out of the clause as originally reported in the convention. And it is equally difficult, I admit, to believe that the *courts of general sessions* were exclusively referred to; for if so intended, as in the case of the common pleas, it would have been most natural and almost of course, to have referred to them by name. And yet the nature of the duties belonging to the district attorney would indicate greater fitness and propriety in conferring the power of appointment upon these courts than upon the common pleas, for he is an officer of the former; and the discharge of his official duties, so far as he is connected with the *county courts*, is confined to them. The general sessions have jurisdiction in all *criminal offences* "not punished with death or imprisonment in the state prison for life." 2 R. S. 208, § 5. And it is made the especial duty of the district attorney to attend the general sessions in the county for which he is appointed "and to conduct all prosecutions for crimes and offences cognizable in such court." 1 R. S. 383, § 89. The extent and weight of the jurisdiction thus conferred upon these courts abundantly assure their

ALBANY,
Oct. 1837.

The People
v.
Albany C. P.

competency to make the appointment. Still we are un-
able to say they are exclusively referred to in the consti-
tution.

Neither court, then, having been designated by name,
and the reference to them being in such general terms as
fully if not necessarily to comprehend both the common
pleas and general sessions, I am of opinion the soundest and
safest conclusion will be to interpret the clause as intended
to include both. We thus avoid conjecture, which can only
be relied on in selecting but one of them, and give full ef-
fect to the language used. If we have failed to catch the
spirit and meaning of the *convention*, we have, at least, yield-
ed our judgment to the force of their language, and the fair
and natural import of the terms employed. There can
be no difficulty in the execution of the power thus confer-
red upon the two courts, and which must have been well
understood by that body; for since the erection of the
court of common pleas, in 1691, both courts have been held
*in the several counties at the same time and place*; and
may have been held by the same officers. The judges em-
powered to hold the common pleas, always possessing au-
thority to hold the general sessions. By the statute in force
at the adoption of the constitution of 1821, three judges of
the county were authorized to hold either court; though
one of them together with two justices of the peace associated,
might · hold the sessions. The constitution, however, I
think, necessarily excludes these magistrates from partici-
pating in the appointment; as the *county courts*, within the
meaning of the term as there used, must be held by the
*judges* therein, also designated: judges who are to be ap-
pointed by the governor and senate, and who hold their of-
fices for five years, unless sooner removed. The terms
*county courts* and *judges of the county courts*, are used in
several sections; in some places for the purpose of desig-
nating the *courts*, and in others the *officers*, and then in art.
5, § 6, there is a provision that the "*judges of the county
courts*, &c. shall hold their offices for five years," &c. A pre-
vious section, art. 4, § 7, had provided for their appointment
by the governor and senate. The fair and reasonable infer-

ence from the above language, we think, is, that a *county court* constituted according to the meaning of the clause in the constitution, must be held by the "*judges of the county courts*" as therein described when engaged in executing the powers conferred upon them by that instrument. The term, in the several places in which it is found, was undoubtedly used to express the same idea ; or in other words, for the purpose of referring to the same courts in the several counties ; and, therefore, when used by way of designating the judges, it must reasonably have the effect of making these officers not only judges of the courts but the *only judges* by whom a county court can be held for those purposes, within the meaning of the constitution. Unless this conclusion as to the officers who must hold the county courts to make the appointment be correct, the provision of the constitution may not be effectual to control the power ; for were it otherwise, any other officer whom the legislature may think proper to designate, may hold these courts. Thus, if we say the term *county court*, means only the *common pleas*, as this court is a mere creature of the statute, not at all recognized by the constitution, the legislature at discretion may provide that justices of the peace shall hold it, and then they would be enabled to make the appointment. This difficulty must unavoidably attend the conclusion that the common pleas were exclusively referred to, because there can be no doubt the legislature may authorize three justices, or any other officers to hold that court, as they already have done in the city of New-York ; the mayor, recorder and aldermen of the city there being judges of the common pleas. But if the term *county courts*, is considered as referring to those only which are held in the counties by the *judges*, designated in the constitution, and to all properly denominated county courts within the meaning of the constitution, which are or may be so held, then the power is beyond the control of the legislature, and is as stable as the instrument itself. Thus, though upon our construction the power of appointment of district attorneys is conferred upon two courts in the several counties, by reason of the very general terms used in the constitution, where the two

ALBANY,
Oct. 1837.

The People
v.
Albany C. P.

organizations held by the judges of the county courts exist, its execution will in truth devolve upon the same individuals; and while there is every security that it will be as well executed as if it had been conferred upon the common pleas, more permanency is given to the execution of the power; for in the one case, the alteration or abolition of the common pleas may have changed or abolished the power, whereas, if we are right in our view, that it is lodged not in one court, but in the *county courts*, whatever may be their particular name, if held by the officers designated in the constitution, any modification, or perhaps even the destruction of one court would not necessarily work a destruction of the power. And this view may have influenced the members of the convention to confer the power upon both courts, knowing that there could be no incovenience in the execution of it, as both have always been held at the same time and place, and could as well participate in it *jointly*, as that the duty should be performed by one of them *separately*.

The main ground assumed against our views and conclusion in the case is, that the convention intended simply to designate the *courts of common pleas* by the term *county courts;* in other words, that it adopted what is supposed to have been the popular title of this court, instead of using the one under which it was erected and ever since has been known in the law. The statutes uniformly referred to it by the title of the court of common pleas, and this is its name in all process and proceedings. Its name in the law must have been familiar to every member of the conventions of 1777 and 1821, especially to the professional members, and we cannot bring our minds to the conclusion, that if they had intended to refer to that court alone, they would carelessly have taken the cognomen by which it might have been known in the community, in preference to its legal statutory title; even were we to concede that such was its popular name to any extent, of which we have no satisfactory proof, either from our own experience or that of others. Mr. Butler, the present distinguished attorney general of the United States, was the first district attorney

appointed in the county of Albany after the adoption of the new constitution, and the record shows that both courts participated in the appointment. Mr. Livingston succeeded him on the 14th June 1825, being appointed by the same authority. He was subsequently appointed by the *common pleas* alone, but by the general act to prevent vacancies in civil offices, Statutes, sess. of 1824, p. 380, incorporated in the 1st R. S. p. 117, § 9, he is continued in office until a successor is duly appointed and qualified.

Upon our view, the relator is entitled to his rule for a peremptory *mandamus* to the court of common pleas.