### DECIDED IN

## THE COURT FOR THE

# CORRECTION OF ERRORS

## OF THE STATE OF NEW-YORK

### In the Year 1840.

---

THE PEOPLE, *ex relatione* THE ATTORNEY GENERAL *vs.* THE MAYOR AND ALDERMEN OF THE CITY OF NEW-YORK.

Whether the *Mayor* and *Aldermen* of the city of New-York may, by virtue of the charter of the city and the various acts of the colonial and state legislatures conferring judicial power upon them, exercise the office of *judges of the county court* of the county of New-York, or whether such office can be exercised only by judges appointed by the governor, and who hold their offices for five years, *quere.**

In April, 1840, the attorney general filed an *information* in the nature of a *quo warranto* against the defendants, for *claiming and    [ *10 ] exercising the office of *judges of the county court* in and for the city and county of New-York. The defendants pleaded that in April,

---

* Decided 28th December, 1840. The SUPREME COURT held in this case that the *Mayor* and *Aldermen* might lawfully sit as judges in the *county courts*, although they neither hold their offices under the governor and senate, nor for a period of five years. The case was removed into the COURT FOR THE CORRECTION OF ERRORS, where after argument, on proceeding to a decision of the question, it was found that the members of the court were equally divided— *ten* voting for a reversal of the judgment of the Supreme Court, and *ten* for an affirmance. Whereupon, of course, according to the settled rule in such cases, judgment of *affirmance* was entered. Opinions *for affirmance* were delivered by the CHANCELLOR and *Senator* EDWARDS and *for reversal* by *Senators* DIXON, HULL and ROOT.

*It seems* that judges BRONSON and COWEN hold that *district attorneys* may be appointed, and *justices of the peace* be removed from office by judges other than those whose term of office by the constitution is fixed at five years; but that the CHIEF JUSTICE has formed no definitive opinion upon the question, except as to the city of New-York, in respect to which he concurs with the other judges.

1839, *Isaac L. Varian* was elected *mayor*, and the other defendants were at the same time elected *aldermen* of the city, one for each ward into which the city is divided, and that they all took the oath of office. They then set up the *charter* of the city granted in 1730, and the several acts of the colonial and state legislatures, by which the mayor and aldermen of the city are authorized to hold *mayor's courts* or *courts of common pleas* and *courts of general sessions of the peace*, in and for the city and county of New-York, and so claim to be judges of the *county court*. To this plea, the attorney general *demurred*, and the defendants joined in demurrer. The case was argued in the supreme court, by

. *F. B. Cutting* and *Willis Hall*, (attorney general,) for the people.

*P. A. Cowdrey*, (corporation counsel,) and *J. R. Whiting*, (district attorney,) for the defendants.

The following opinion was delivered in the supreme court :

*By the Court*, BRONSON, J. It is unnecessary to refer particularly to the ancient charters of the city, or to the several statutes passed by the colonial and state legislatures, conferring judicial powers upon the mayor and aldermen of the city of New-York. As there is no controversy upon that point, it is sufficient to say, that for more than a century immediately preceding the time of filing this information, the mayor and aldermen of the city of New-York have been authorized by law to exercise, and have in fact exercised all the judicial powers which they now claim. They have been judges or members of the mayor's court, afterwards called the court of common pleas and the court of general sessions of the peace in and for the city and county of New-York, which are the only county courts ever authorized to be held in that county. They have also been members of the court of oyer and terminer and justices of the peace, with larger *powers than were ever conferred on justices of the peace in other counties. Since the present constitution was adopted in 1822, most, if not all, of their former powers have been recognized and confirmed by the legislature. I will only refer to such of these enactments as have an immediate bearing upon the question before us. On the revision of the laws in 1830, the mayor and aldermen were declared judges of the court of common pleas, and power was given them, in conjunction with other officers, to hold courts of general sessions of the peace and of oyer and terminer. 2 *R. S.* 215, § 22, *p.* 216 § 27, *and p.* 204, § 28. I need not notice other statutes, because it was not denied on the argument that the defendants are entitled to all the privileges which they claim, if the legislature had power to make the grant.

Albany, December, 1840.—*The People v. The Mayor and Aldermen of New-York.*

The attorney general has filed this information on the ground, and he insists, that the charter of 1730, and the statutes prior to 1822, conferring judicial powers upon the mayor and aldermen of the city of New-York, were abrogated by the constitution; and that the subsequent enactments on the same subject are repugnant to that instrument, and consequently void. He relies mainly on that clause of the constitution which provides that " the governor shall nominate by message in writing, and with the consent of the senate shall appoint, all *judicial officers,* except justices of the peace," *art.* 4, § 7; and the argument is, that the mayor and aldermen of the city of New-York are "judicial officers;" and as they are not *appointed* by the governor and senate, but *elected* by the people, they cannot exercise the judicial powers which the legislature has attempted to confer upon them.

It is worthy of remark, that although eighteen years have elapsed since the adoption of the constitution, during all which time the defendants and their predecessors in office have continued to exercise the various judicial powers conferred upon them by law, yet no one has ever before thought of raising the question which is now presented for our consideration. Within that period our statutes have undergone a thorough revision by eminent jurists; the lives, liberty and property of many individuals have been at stake in courts *where the mayor and aldermen have sat in judgment; [ *12 ] and yet neither revisers nor legislators, judges nor counsel, defendants nor criminals, seem ever to have doubted the validity of the laws which are now said to be repugnant to the constitution. This consideration may justly be regarded as proving something in favor of the title which the defendants set up. But it is never too late to appeal to the fundamental law; and I shall therefore consider the question in the same manner as though it had been presented immediately after the adoption of the constitution.

The short answer to this supposed constitutional difficulty is, that the mayor and aldermen of the city of New-York are not " judicial officers," and consequently the seventh section of the fourth article of the constitution has nothing to do with the case. They are *legislative* and *executive* officers; and although in addition to their more appropriate duties, certain *judicial powers* have been cast upon them, they are not, in the proper sense of the term, " judicial officers." The constitution speaks in technical language of a well known class of public officers, and there is nothing to indicate an intention to include those belonging to any other department of the government. It speaks only of a single class, and not of officers who may be ranked under more than one class. It does not say that officers whose duties are both executive and judicial, shall be appointed by the governor and senate, but only that judicial officers shall be so appointed. It does not speak of judicial *powers,* but of judicial *officers.*

The framers of the constitution were, in the fourth article, settling the

mode of appointment and election to offices. They were distributing the powers which had before been exercised by the council of appointment. When they came, in the seventh section, to speak of " judicial officers," they evidently had in view the chancellor, justices of the supreme court, circuit and county judges, surrogates and other officers properly belonging to the same department of the government. This is not only apparent from the words which they used, but it is further proved by the *excep-*
[ *13 ] *tion* which they *made of " justices of the peace," who are strict-ly " judicial officers."

The whole argument against the title of the defendants is based on the assumption, that every person who exercises judicial *powers*, is a " judicial *officer*," within the meaning of the constitution. The attorney general must necessarily go this length, before he can bring the defendants, who are properly legislative and executive officers, within the influence of the seventh section of the fourth article. This construction not only goes beyond the just import of the language of the constitution, but it will bring the seventh section into direct and necessary conflict with other portions of the same instrument. Indeed it will, I think, go very far towards upsetting the whole frame of the government; for there are few officers in the state, from the highest to the lowest, who do not sometimes exercise judicial powers. I will only mention a few cases, by way of example, where officers, who are not appointed by the governor and senate, have been vested with judicial powers. Among the number of *executive* officers who exercise such powers, the governor, secretary of state, comptroller, treasurer, attorney-general and surveyor-general, must all be included. Sheriffs act judicially in executing writs of inquiry, coroners in holding inquests, and clerks of courts in assessing damages. Commissioners of highways exercise judicial powers in laying out roads; assessors and trustees of school districts, in making their assessment rolls ; commissioners of deeds, in judging of the proofs made before them ; and fence viewers, in appraising damages. And then we have *legislative* officers, who are also vested with judicial powers. The senators sit in the court for the trial of impeachments and the correction of errors ; and the lieutenant governor, who, like the defendants, is both a *legislative* and an *executive* officer, presides and dispenses justice in the court of last resort. Now, if the argument is sound, that all officers who exercise judicial powers come within the influence of the seventh section of the fourth article, then all the officers I have enumerated, and others which might be added to the catalogue, must be appointed by the governor and senate. Such a proposition is too absurd to call for a single remark by way of re-futation.

[ *14 ]      *But it is said that other parts of the constitution have provided that several of the officers I have mentioned shall be elected or ap-

pointed in some other way than by the governor and senate, and thus they are taken out of the operation of the seventh section. This argument proves the justice of the remark already made, that the construction for which the attorney general contends, will bring one portion of the constitution into direct and necessary conflict with other parts of the same instrument. An alderman of the city of New-York, it is said, comes within the influence of the seventh section, because he exercises judicial powers. If the argument be sound, then, beyond all question, a senator also comes within the influence of that section; and thus we have one clause of the constitution saying that a senator shall be appointed by the governor and senate, and another declaring that he shall be elected by the people. A similar remark will hold true in relation to the governor, lieutenant governor, and other state officers, sheriffs and clerks of courts and of counties. One clause of the constitution refers the appointment of those officers to the governor and senate; and the other clauses of the same instrument provide that they shall be elected or appointed in some other way. We are not at liberty to adopt such a construction of the seventh section, as will put this contradictory language into the mouths of the framers of the constitution. On the contrary, we are, if possible, so to read the instrument, that each particular clause will stand in harmony with every other provision which it contains. That end can be accomplished by reading the seventh section as it is written, without extending its influence by construction.

I may here remark, that if *any* executive or legislative officer can be brought within the meaning of the seventh section, because he possesses judicial powers, then *every* such officer falls within the influence of the clause, however unimportant may be his judicial functions. The language is general: *all* judicial officers;" and the *single exception* which follows, of "justices of the peace," goes further to prove the universality of the provision. If a senator is a "judicial officer," within the meaning of this clause, because he sits in the court of errors; then also is a fence viewer a "judicial officer," *within the meaning of the same clause, be-  [ *15 ] cause he sits in judgment for the appraisal of damages, and to settle disputes in relation to division and other fences.

It is, I think, a complete answer to the construction urged against the defendants, that it brings one portion of the constitution into conflict with another. But I will now assume that the construction is a sound one, and that the seventh section includes all officers who exercise judicial powers. It is then said that a senator is taken out of the operation of the section, because the first article of the constitution provides that he shall be elected by the people. If the two clauses provide for difficult modes of filling the office, how shall it be determined which clause shall prevail? If we adopt the rule of construction given by the Revised Statutes, that which comes

15          CASES IN THE COURT OF ERRORS

Albany, December, 1840.—The People v. The Mayor and Aldermen of New-York.

last is the best—the fourth article will prevail over the first—and then senators are to be appointed by the governor and senate. But waiving that consideration, and conceding that a senator is taken out of the operation of the seventh section of the fourth article, because another part of the instrument has provided that he shall be elected by the people, then it is, I think, equally clear that an alderman of the city of New-York is taken out of the operation of the section by the same rule of interpretation. The aldermen of that city had been elected by the people, for more than a century prior to the adoption of the constitution; and that instrument provides, that " all officers heretofore elective by the people shall continue to be elected." *Art.* 4, § 15. I do not perceive that it needs a single word of comment to prove that an alderman is as completely removed from the influence of the seventh section, as is a senator.

It may be said that the constitution, in providing the mode of election and appointment of offices, has specially mentioned the case of a senator; and that is also true of the governor, lieutenant governor, and most of the other state officers; and of sheriffs, coroners, and clerks of the courts and of counties. *Art.* 1 § 2. 5. *Art.* 3, § 1, 2, 3. *Art.* 4, § 6, 8, 9, 11. It will be seen, however, that in some instances the mode of election or appointment was only mentioned incidentally where it was not the main purpose in hand. But aside from that consideration, the fifteenth section of the fourth article is *just as conclusive upon this question as though the aldermen of the city of New-York had been specially named in it. " *All* officers heretofore elective by the people shall continue to be elected ;" and clearly if the aldermen, without being named in it, can be brought within the influence of one general clause which provides for the appointment of " all judicial officers," they may also be included in another general clause, equally comprehensive in its terms, and which secures to the people the future election of " all officers heretofore elective" by them.

[ *16 ]

It is worthy of remark, that the convention gave many things to the people, while it took nothing from them ; and its labors in relation to the mode of filling offices were concluded by the sweeping provision that the people should continue to elect " all officers" which they had before elected. If there were room for any doubt upon the question, we ought to lean to that construction which takes the appointment from the central power, and gives it to the people.

I will add, upon this branch of the case, that, although the constitution has specially provided for the election or appointment of some officers who exercise judicial powers, yet there are other officers who possess judicial functions, and in relation to whose appointment no special provision has been made. Commissioners of highways and of deeds, assessors, trustees of school districts, and fence viewers are among the number. The mode of electing or appointing these officers depends on general clauses in the con-

## OF THE STATE OF NEW-YORK.     16

Albany, December, 1840.—The People v. The Mayor and Aldermen of New-York.

stitution; and if an alderman is not included in the fifteenth section of the fourth article, because not specially named in it, then none of the officers I have mentioned can be elected by the people for the same reason.

Although it was not said in terms that the New-York aldermen must be appointed by the governor and senate; yet in effect the argument comes to that. The seventh section, on which it is based, does not say what officers shall or shall not *exercise judicial powers;* it only declares the mode in which a particular class of officers shall be *appointed;* and the true inquiry is the one already considered—do the aldermen belong to that class? When the question is answered, the discussion upon the seventh section seems to be at an end.

*It may, however, be conceded, for all the purposes of this case, that the legislature could not now, for the first time, confer judicial    [ *17 ] powers upon an executive officer not appointed by the governor and senate; that they could not for example vest the governor, or a sheriff, with the judicial functions of the chancellor, a surrogate or county judge. such a law, although not within the letter, would, perhaps, be deemed repugnant to the spirit of the constitution. But that is not the case. The framers of the constitution found the aldermen of the city of New-York not only elective officers but in the rightful exercise of the same judicial powers which they now claim; and they left the matter just where they found it, without adding a single word to indicate the purpose of abridging these powers. Had it been deemed expedient to take away the judicial functions of these or any other elective officers it is but reasonable to suppose that the intention would have been plainly manifested. It would not have been left to be spelt out by doubtful constructions of clauses which were designed, primarily, at the least, to answer other ends. And here I may repeat that the convention of 1821 secured to the people many privileges which they did not before enjoy, such as the election of sheriffs, coroners, and clerks of counties, and the extension of the elective franchise, without in any instance declaring the purpose of taking any thing from them. When the general intention thus plainly appears to increase, rather than diminish the constitutional powers of the people, we certainly ought to proceed with the utmost caution in taking away any of their privileges by construction.

The fact that the election of several officers who exercise judicial powers was expressly, and for the first time, given to the people by the constitution of 1821, goes far to prove that the framers of that instrument neither intended to take from the people the election of aldermen of the city of New-York, nor to divest those officers of the judicial powers which they had so long exercised. Since that period the principle has been extended by providing for the election of justices of the peace, who are strictly judicial officers. *Amendment I. adopted in* 1826. While we see in our fundamental law *this tendency to enlarge the privileges of the peo-    [ *18 ]

ple, we ought not to be over astute in finding out grounds for abridging those privileges, either by denying the ancient right to elect aldermen, or by divesting those officers of a part of their functions because they do not hold under the governor and senate.

In concluding what I have to say on this branch of the case, I will refer to an act which has been passed within the brief period which has elapsed since the filing of this information, for the purpose of showing that the legislature still entertains the opinion upon which it had so often acted before, that the constitution has not forbidden the mayor and aldermen of the city of New-York to exercise judicial powers. By the third section of the act of May, 1840, it is enacted, that the *aldermen* may, with other officers, hold " courts of special sessions of the peace ;" and by the tenth section of the same act, the *mayor* is authorized to participate in the appointment of the *district attorney* for that county. *Statutes* of 1840, *p*. 257. It will be seen that this act expressly confers judicial powers upon the aldermen ; and as the constitution provides, *art*. 4, § 9, that district attorneys shall be appointed by " the county courts," the legislature could only have authorized the mayor to take part in the appointment, on the ground that he was a legal member of those courts. It is evident, therefore, that the doubt which induced the filing of this information, has had no influence upon the legislature. The uniformly concurring testimony of both the other departments of the government, tends to fortify the opinion which we entertain that the constitution has neither changed the mode of electing aldermen, nor deprived those officers of any of their ancient powers or privileges.

II. Another argument urged against the defendants remains to be considered. The constitution declares that judges of the county courts, and recorders of cities, shall hold their offices for five years. *Art*. 5, § 6. And it is said that none but those judges can sit in the county courts.

Before entering upon a particular examination of this argument, it may be proper to remark, that we have never had any " county court," [ *19 ] *eo nomine,* in this state. With two *exceptions, 1 *Van Shaack,* 196, § 7, *and Statutes of* 1821, *p*. 64, § 1, I have not noticed any statute, passed either before or since the revolution, which speaks even incidentally of the " county court ;" and we certainly have had no judicial *forum* which bore that legal denomination. But we have long had courts, " which, from their jurisdiction, business, local organization and character," are sufficiently designated by the name of " county courts." Such are the two courts in each county, of common pleas and general sessions of the peace. *The People* v. *Albany C. P.* 19 *Wend*. 27. The true question, therefore, is, whether the statutes which declare that the defendants shall be members of those courts for the county of New-York, are repugnant to the constitution.

Albany, December, 1840.—The People v. The Mayor and Aldermen of New-York.

We recently had occasion to consider the question, and then came to the conclusion, that our county courts did not depend for their organization upon the constitution, but were mere creatures of the statute law. *The People* v. *Albany C. P.* 19 *Wendell*, 27. If we were not mistaken in that opinion, it is quite clear that the constitution cannot have been violated by the statutes which declare what officers shall hold those courts.

But I will examine the question a little further. The constitution no where mentions the " county courts" by way of providing for their organization. In the clause in question, they are only mentioned for the purpose of declaring how long certain officers called "judges of the county courts," shall hold their offices. Another clause provides that a justice of the peace may be removed " by the *county court*, for causes particularly assigned by the judges of the said court." *Art.* 4, § 7. A third clause provides that district attorneys shall be appointed " by the county courts," and " shall hold their offices for three years, unless sooner removed by the *courts* appointing them." *Art.* 4, § 9. And a fourth clause declares that equity powers may be vested " in the *county courts.*" *Art.* 5, § 5. There is nothing in these provisions which necessarily controls the discretion of the legislature in providing for the organization of the courts. The officers called "judges of the county courts," hold their offices " for five years ;" but neither their powers nor their duties are *prescribed [ *20 ] by the constitution. Their right to sit in the county courts, like that of the mayor, aldermen, and justices of the peace, depends upon the statute law.

There is no great difficulty in this question, if we read the sixth section of the fifth article as it is written, without implying any thing beyond the just import of the language. " Judges of the county courts" are not mentioned for the purpose of prescribing their powers or duties, but for the single purpose of fixing the tenure of their offices. Formerly the first judge held during good behavior, or until sixty years of age ; and the other judges not exceeding three years. The framers of the present constitution resolved upon a change, and declared one tenure for all. " Judges of the county courts shall hold their offices for five years." They probably supposed that those judges would continue to sit in the county courts, as they had done before ; but they did not incorporate any such provision in the constitution. And before we can say that those judges *must* hold the county courts to the exclusion of all others, or even that they have a *constitutional* title to sit in the county courts at all, we must go beyond the language of the constitution, and make out their title by implication ; and that too when we cannot but see that the convention had nothing in view beyond a change in the tenure of the office.

The constitution of 1777 mentions " the county courts," and the

" judges of the county courts," in the same manner substantially as the present constitution. The twenty-fourth section declared that the chancellor, judges of the supreme court, and " *first judge of the county court in every county,* hold their offices during good behavior," &c. The twenty-fifth section provided that " *the first judges of the county courts* in the several counties" should not hold any other office ; and the twenty-eighth section that new commissions should be issued " to *judges* of the *county courts,* (other than to the *first judge,*) once at the least in every three years." If the argument is sound, that no judges can at this time sit in the county courts except such as " hold their offices for *five years,*" then it is clear that, under the former constitution, no judges could sit in those courts except a " *first judge*" who held his office " during good behavior," and [ *21 ] *other " *judges of the county courts,*" who held their offices for three years, unless sooner removed by the appointing power ; and yet other officers have constantly sat in those courts ever since the first organization of the state government. *Assistant justices,* who are not mentioned in the constitution, were by law made members of the courts of common pleas ; and *justices of the peace,* and the *mayor, recorder* and *aldermen* of cities, were authorized to sit in the courts of general sessions of the peace. There is no longer any such officer as an assistant justice ; but since the adoption of the present constitution, one judge, instead of a majority of the judges, has been authorized to hold courts of common pleas in several of the counties ; justices of the peace have still continued to sit in courts of general sessions of the peace ; and the mayor, recorder and aldermen of the city of New-York have continued to be members of the county courts for that county.

This information, in effect, affirms that the whole course of legislation on this subject since 1777, has been repugnant to the constitution, and that we have never had any legally constituted county courts in this state. If there can be any doubt concerning the justice of this remark, in relation to other counties, there certainly can be none in relation to the county of New-York ; for that county has never had such an officer as " a judge of the county courts." Their county courts, down to the year 1821, were held by the mayor, recorder and aldermen of the city, exclusively. In that year, provision was made for a first judge of the court of *common pleas ;* and since that time two associate judges of the *same court* have been added ; but without touching the right of the mayor and aldermen to sit in that court, as well as in the general sessions. *Statutes of* 1821, *p.* 64 ; 1834, *p.* 118 ; *and* 1839, *p.* 96. But the argument against the defendants reaches all the county courts in the state ; for in every county, other officers than those mentioned in the sixth section of the fifth article, have been, and still are, authorized by law, to sit in one at least of the county courts.

Although I cannot yield to mere legislative interpretation, against what may seem in any case, a plain declaration of the *constitu-  [ *22 ]
tion, I cannot but feel the force of a construction which has uniformly prevailed, and which, without one word of question, has been sanctioned by all branches of the government, from the time of the revolution down to the year 1840.

But we need not in this case refer to legislative constructions of the constitution, *by way of authority.* It is enough to mention what had previously been done, by way of showing what was the *existing state of things* at the time the constitution was adopted. That will be sufficient to dispel any doubt which might otherwise rest on the title of the defendants. The former constitution, as we have already seen, spoke of the " county courts," and the " judges of the county courts," in the same manner substantially as they are mentioned in the present constitution. When the convention assembled in 1821, to revise the frame of government, the members very well knew what construction had previously prevailed. They knew that other officers than those mentioned in the constitution were authorized by law to sit in the county courts; they knew how those courts had, in fact, been constituted for nearly half a century, and what had been the practical working of the system. Had they designed to correct what they deemed an erroneous construction of the constitution, or for any other cause, to effect a change in the organization of the county courts, they would, undoubtedly, have said so. But they did no such thing. On the contrary, by adopting the language of the former constitution, they plainly sanctioned the construction which had already been given to that instrument, and left the organization of the county courts, as they found it, to the discretion of the legislature. They spoke of the courts as *existing institutions*—" the county courts;" and not by way of authorizing—much less of requiring—*a new creation.* Whether the county courts had before that time, been properly constituted or not, I do not see how it can well be denied that the *actual organization* was ratified and approved by the convention of 1821.

The first legislature which assembled under the new constitution, understood that this matter had been left to its *discretion;  [ *23 ]
and an act was passed authorizing justices of the peace to sit in the courts of general sessions. *Statutes of* 1823, *p.* 40. And so the matter has been understood by every succeeding legislature which has had occasion to act upon the subject, as well as by the revisers of the laws. Even since this information was filed, and notwithstanding the doubt which such a measure on the part of the law officer of the government might well occasion, an act has been passed authorizing the appointment of two " *associate judges* of the court of *general sessions* of the city and county of New-York." *Statutes of* 1840, *p.* 257. The constitution says nothing about

" *associate* judges;" and besides, it speaks of the "judges of the county courts" in the plural. If the argument is sound, that no judges save such as are mentioned in the sixth section of the fifth article, can sit in the county courts, it seems to follow that these new judges, who want the constitutional name, and are only appointed for one of the county courts, have no title to their offices. But I do not think, that either their title, or the title of the defendants, can be successfully impeached on the ground that they are not such judges as are mentioned in the constitution.

But the constitution contains something more on this subject. It provides that " the clerk of the court of oyer and terminer and *general sessions of the peace* in and for the city and county of New-York, shall be appointed by the *court of general sessions of the peace* in said city, and hold his office during the pleasure of the said court." *Art.* 4, § 13. One of the New-York county courts, which was then held by the mayor, recorder and aldermen of the city, is here mentioned by its statute name; and it seems impossible to deny that the convention intended to acknowledge and sanction it as a legally constituted court.

In relation to both clauses of the constitution which are supposed to bear against the title of the defendants, we are of opinion that the construction which has hitherto prevailed is the true one; and that the mayor and aldermen of the city of New-York may rightfully sit in the county courts, although they neither hold their offices under the governor and senate, nor for a period of five years.

[ *24 ]    *I ought, perhaps, to notice one or two other matters which were mentioned on the argument. It is said that the mayor and aldermen of the city of New-York, though members of the county courts; and justices of the peace in other counties, though members of the courts of general sessions, cannot participate in the appointment of district attorneys; and an intimation to that effect was thrown out by the chief justice in *The People* v. *Albany C. P.* But that was only a passing remark—the point not being involved in the case—and the question is therefore open for further consideration. I feel no great difficulty in saying, that the county courts as *actually organized by law*—when it is once settled that that organization is not repugnant to the constitution—may discharge *all* the duties with which those courts have been charged. We have officers who are called " judges of the county courts;" but the constitution does not refer the appointment of district attorneys to those or any other *judges*, but to " *the county courts.*" *Art.* 4, § 9. I do not see on what principle it can be denied that the " county courts," by whatever officers they may be held,—provided the organization be a legal one—may appoint and remove district attorneys, as well as they can execute any of the other powers which have been conferred upon them. Such also, seems to have been the understand-

ing of the legislature. At the first session after the constitution took effect, it was enacted that justices of the peace might sit in the courts of general sessions ; but a *proviso* was added, that they should not sit in court upon the appointment or removal of a district attorney, or upon the removal of a justice of the peace. *Statutes of* 1823, *p.* 40, § 3. The proviso was entirely useless, if without it, the justices could not have taken part in the discharge of those duties. Again : when it was provided that the court of common pleas of the county of Albany might be held by the first judge alone, a section was added, that no district attorney should be appointed or removed, nor should a justice of the peace be removed, unless the court should, at the time, consist of at least three judges. 2 *R. S.* 217, § 32, 33. And here I may refer once more to the act of May 14, 1840, the tenth section of which provides that the *mayor* and certain \*other [ \*25 ] officers—none of whom are " judges of the county courts"—within the meaning of the sixth section of the fifth article of the constitution—shall appoint the district attorney of the city and county of New-York. Although this provision is subject to the objection that it does not give the appointment to the *courts*, but to the *judges*, *The People* v. *Albany C. P.* 19 *Wendell*, 27, still it plainly manifests the sense of the legislature that other judges than those mentioned in the constitution may take part in the appointment of district attorneys.

It is said also that none but judges who hold their offices for five years can act in the removal of a justice of the peace. The argument to support this position differs only in a single particular from that in relation to the appointment and removal of district attorneys. " Every person appointed a justice of the peace shall hold his office for four years, unless removed by the *county court*, for causes particularly assigned by the *judges of the said court.*" *Art.* 4, § 7. Now here again it is the court which is to make the removal ; and I cannot perceive why any legally constituted " county court" may not do the act. But a difficulty is supposed to arise out of the fact that causes are to be assigned by the *judges*. The difficulty is created by assuming that the judges mentioned in this clause must be the same as those mentioned in the sixth section of the fifth article who " hold their offices for five years." But that is assuming more than the section under consideration will warrant. Causes are to be assigned by " the judges of *the said court.*" This can mean no more than that causes shall be assigned by the judges *who actually* sit in the court at the time the act is done, whatever may be the tenure of their offices. It is enough that they are lawful judges. There is certainly nothing new in saying that the same word may have different applications when found in different parts of the same instrument ; and it is, therefore, assuming too much to say that the " *judges* of the county courts" mentioned in one section are necessarily the same *judges* who, by another

section are required to assign reasons for the removal of a justice of the peace.

Should such a measure be deemed expedient, the legislature may [ *26 ] provide that the mayor, aldermen, associate judges, *&c. although members of the court for other purposes, shall not constitute a part of the court when engaged in the appointment or removal of district attorneys, or the removal of justices of the peace. Laws involving the same principle have heretofore been passed, and I do not perceive that they are subject to any serious objection. But so long as the laws authorized the mayor and other officers I have mentioned to sit in the county courts, without any limitation of their powers, they may, like the other judges, take part in any business which properly belongs to the court.

In the city of New-York, the powers conferred by the constitution upon the county courts, if they are exercised at all, must of necessity be exercised by other officers than those memtioned in the sixth section of the fifth article. On that ground the chief justice thinks there may be a distinction between New-York and other counties; and he does not wish to be understood as having formed a definitive opinion upon the question whether, in those counties where there are "judges of the county courts," any other officers can take part in the appointment of district attorneys, or the removal of justices of the peace.

I have purposely abstained from expressing any opinion on the question discussed on the argument whether the legislature, without the consent of the corporation, can take away any of the privileges conferred the city of New-York by its ancient charters—not because I feel any difficulty on the question—but because it is not now properly before us.

We are all of opinion that there has been no usurpation on the part of the defendants.

. Whereupon judgment was rendered for the defendants. The attorney general sued out a writ of error removing the record into this court, where the cause was argued by

*C. O' Connor and Willis Hall,* (attorney general,) for the people, and by

*P. A. Cowdrey,* (corporation counsel,) and *J. R. Whiting,* (district attorney,) for the defendants.

*Points on the part of the People :*
[ *27 ]        *First point—*The term " county court," in the constitution of this state, applies to the principal court having civil jurisdiction

co-extensive with the county which then existed and had long previously existed in each county of the state. *Constitution of* 1777, § 24. *Constitution of* 1821, *art.* 4, § 13. *Art.* 5, § 5. *Laws of* 1821, *p.* 64, § 1.

I. The case of *People* vs. *Albany Common Pleas*, 19th *Wendell*, *p.* 27, so far as it conflicts with this proposition, is erroneous. It is virtually over-ruled by the opinion of the supreme court in the present case.

II. Certain duties are assigned in the constitution to the judges of the county courts as judges out of court, which fact alone conclusively repels the position that there is no county court except where two or more courts are in *joint session. Constitution of* 1821, *art.* 4, § 7.

III. Two courts not *organized* in any *joint* capacity, having neither clerk, seal or process, and each having distinct judges, could not operate at the same time, on and the same subject, without great inconvenience.

*Second point*—The defendants being *annually elected* mayor and aldermen of the city of New-York, cannot be judges of the county court by virtue of that election, because the constitution fixes the term of office of judges of the county court at five years, and declares that they shall be nominated, and with the consent of the senate, appointed by the governor. *Constitution of* 1821, *art.* 5, § 6. *Art.* 4, § 7. *People* vs. *Morrill*, 21 *Wendell*, *p.* 563. *Commonwealth* vs. *Collins*, 8 *Watt's Penn. R. p.* 340–1. 1 *Gallison*, 341.

*Third point*—The constitution ought not to receive a different construction in this respect as applied to the city of New-York from that which is given in reference to other counties of the state. *Constitution of* 1821, § 1, *art.* 1. *Vanhorn's lessee* vs. *Dorrance*, 2 *Dallas*, *p.* 308. *Hosford's Convention Debates, p.* 394.

I. The numerous colonial and legislative acts authorizing the mayor and aldermen of the city of New-York to sit as *judges of [ *28 ] the city courts, will not sustain the claim of the defendants ; for those enacted prior to the adoption of the constitution are expressly abrogated by it, so far as they are inconsistent with it, and all subsequent acts are of course enacted subject to it. *Constitution of* 1821, *art.* 7, § 13.

II. The constitution is paramount to the charter of the city, and if there is any incongruity, the constitution must prevail, even to the entire destruction of the charter. The defendants cannot therefore protect themselves by their charter against the constitution.

III. There is no provision in the constitution which excepts the defendants, either directly or by implication, from its general operation.

1. The exception of justices of the peace does not apply to them. *Constitution of* 1821, *art.* 4, § 7. They are not justices of the peace, (*Const. amendment, No.* I.) and justices of the peace are not judges of the county court. *People* vs. *Albany Common Pleas*, 19th *Wendell*, *p.* 27.

2. They are not excepted by the clause " all officers heretofore elective by the people shall continue to be elected. " *Constitution of* 1821, *art.* 4, § 15.

The offices of aldermen and of judge of the county court, although held by one person are perfectly distinct. 2 *Lev. p.* 245, *Wilcock on Corporations, p.* 298. Judges of county courts never were elected by the people.

3. The reservation that " nothing in the constitution shall annul any charters to bodies politic and corporate," does not protect the defendants in their claim, *Constitution of* 1821, *art.* 7, § 14, because the constitution, in taking from the aldermen the powers of judges of the county court, did not thereby annul the charter of the city.

4. The naming of the court of " oyer and terminer," and " general sessions of the peace," in the constitution, *art.* 4, § 13, does not recognize the right of the defendants to be judges of those courts ; because these courts are not peculiar to the county of New-York, but the recognized and established courts of every county in the state.

5. The exercise of judicial power is a public and political right, [ *29 ] which is incapable of becoming vested in any number *short of the whole people. *Terret & al.* vs. *Taylor & al.* 9 *Cranch* 43. *The People* vs. *Morris,* 13 *Wend. p.* 325. *Kent's Notes on the Charter, p.* 141, (*on ferry rights,*) *p.* 143, (*on laying out streets*) *p.* 149, (*on measurers of grain,*) *Satterlee* vs. *Sutton, in superior court, decided by Ch. J. Jones. The town of Marietta* vs. *Fearing,* 4 *Hammond, Ohio Rep.* 432. *Dartmouth College* vs. *Woodward,* 4 *Wheat,* 518, 694, *per Storey. Kent's Commentaries,* 245.

*Points for the defendants in error :*

*First point*—The court of common pleas for the city and county of New-York, or the court of general sessions, or both combined, constitute the county court for the city and county of New-York. *Laws* 1736, (*Van Schaack,*) *chap.* 656, *p.* 196, § 7. *Sess. Laws* 1821, *chap.* 72, *p.* 64, § 1. *The People* v. *Albany C. P.* 19 *Wendell* 27. 1 *R. S.* 453, § 5 & 7.

*Second point*—The mayor and aldermen of the city of New-York, for more than a century previous to the constitution of 1822, by virtue of the charter of the city, and laws of the colony and state, were judges of the county courts of the city and county of New-York. *Charter of* 1686, § 8, 15. *Charter of* 1730, § 26, 27. *Laws of* 1787, *chap.* 10, § 5, 1 *Greenleaf* 307. *Id.* 1797, *chap.* 1, § 4, 3 *Greenleaf* 356. *Id.* 1821, *chap.* 72, *p.* 64, § 2.

*Third point*—The constitution of 1822 was not intended to, and did not abrogate any of the powers of the mayor and aldermen of the city of New-York as judges of the county courts.

Albany, December, 1840.—The People v. The Mayor and Aldermen of New-York.

I. The seventh section of the fourth article of the constitution does not include within its provisions the mayor and aldermen of the city of New-York.

1. The appointment of the mayor is provided for by the tenth section, and the election of the aldermen by the fifteenth section of the same article.

2. The appropriate duties of the mayor and aldermen are more of a legislative and executive, than of a judicial character ; *hence, although they are invested with certain judicial powers, they cannot    [ *30 ] be properly classed as "*judicial officers.*"

3. The position that the seventh section is to have any reference to the mayor and aldermen, leads to requiring that these officers should be appointed by the governor and senate.

II. The seventh section does not limit the exercise of *judicial powers* to officers appointed by the governor and senate ; it only provides for the appointment of a particular class of public officers by their *name of office.*

1. If this section is to exclude the mayor and aldermen from exercising any judicial power, it must also exclude the governor, the secretary of state, the comptroller, treasurer, attorney general, and surveyor general, all sheriffs, coroners, county clerks, commissioners of deeds, commissioners of highways, canal commissioners, fence viewers, and members of courts martial, from exercising any of their judicial powers.

2. Such a construction would make the 7th section of the 4th article at variance with the 5th section of the 1st article, and with the 6th, 8th, 10th, 11th, 14th, and 15th, sections of the 4th article of the constitution.

3. If the construction is to prevail, the mayor and aldermen of the city will be divested, not only of their judicial powers as members of the county courts, but of the judicial powers conferred on them by *Statutes of* 1813, *chap.* 86, § 77, 81, 82, 206. *Id.* 1830, *chap.* 291, § 31, 32, 33, 36. *Id.* 1833, *chap.* 11, § 1, 4, 5, 8, 20, 21, 23. 1 *R. S. p.* 673, § 61. *Id. p.* 674, § 64, 65, 67. *Id. p.* 676, § 73. 2 *R. S. p.* 159, § 29, 30, 31, 32, 34. *Id. p.* 704, § 1. *Id. p.* 743, § 9.

4. Such construction will render unconstitutional all the provisions of the Revised Statutes, and of the acts passed since the adoption of the constitution, which confer and confirm the judicial power of the mayor and aldermen of New-York. 2 *R. S. p.* 204, § 28. *Id. p.* 215, § 22. *Id. p.* 216, § 42, 46. *Id. p.* 223, § 1. *Statutes of* 1840, *chap.* 311, *p.* 257, § 3.

III. The 6th section of the 5th article of the constitution, which provides that judges of the county courts shall hold their offices for five years, simply effects a change in the *tenure of those officers,    [ *31 ] *properly styled "judges of the county court,"* such being their *official title*—the constitution of 1777 having provided that the " first judge of

the county court" in every county should hold his office during good behavior or until he should arrive at sixty years of age, and that the other "judges of the county court" should hold their offices during 'the pleasure of the council of appointment, new commissions, however, to issue once at least in three years. *Constitution of* 1777, § 25, 28.

This section does not limit the right to sit as members of the county court to judges holding their offices for five years; it does not even confer that right upon those whom it designates "judges of the county courts."

*Fourth point*—The constitution of 1821, does not profess to organize the county courts. It found them already organized and expressly refers to them and ratifies them as such, and confers upon them certain new powers. *Constitution of* 1822, art. 4, § 7, § 9, § 13. *Id.* art. 5, § 5, § 6.

*Fifth point*—The charters of the city of New-York, of 1686 and 1730, which confer upon the mayor and aldermen the power to sit as judges of the county courts, were not forfeited by the revolution of 1776, or by the adoption of the constitution either of 1777 or of 1821; and by the express terms of both those constitutions it was provided that *nothing therein contained* should annul such charter.

After advisement, the following opinions were delivered:

*By the* CHANCELLOR. The information in the nature of a *quo warranto*, was filed against the several defendants by the attorney general, for the purpose of obtaining a judicial decision, depriving them of the right which they claim, under the charter of the city of New-York and the several statutes of the state, to execute the duties of the office of judges of the county courts and courts of oyer and terminer in that city, by virtue of their respective offices of mayor and aldermen. That the defendants were duly and constitutionally elected to the offices of mayor and aldermen of the city of New-York, and were duly qualified according to law, is admitted [ *32 ] *by the demurrer. Nor is it denied on the part of the attorney general that the statutes of this state, as well as the provisions of the city charter do in terms confer upon the mayor and aldermen the power and right to act as such judges *ex officio*. It is insisted, however, by him and the other counsel for this prosecution, that the provisions of the city charter and of the several statutes of the state, under which the defendants claim the right to exercise such judicial powers, are in conflict with the constitution, and therefore void.

The provision of the constitution which is principally relied on by the attorney general, and the other counsel for the plaintiffs in error, to show that the mayors and aldermen of cities who are elective officers, cannot *ex officio* be judges of the local courts in their respective cities, nor exercise the

various other judicial powers attempted to be conferred upon them by the statutes of the state or their city charters, is the seventh section of the fourth article of the amended constitution of 1821. That section provides that all judicial officers, (except the justices of the peace in the several towns, whose appointment was otherwise provided for in the same section,) shall be appointed by the governor with the consent of the senate. The sixth section of the fifth article is also relied upon by the attorney general as showing that the term of office of judges of county courts is fixed at *five years*, and, therefore, that the mayor and aldermen of New-York who are elected *annually* cannot *ex officio* exercise the powers and duties of judges of those courts in that city. If these were the only provisions in the constitution which were applicable to the appointment of officers who were then in the actual discharge of the duties of judges of the county courts in the city of New-York, in virtue of their election or appointment to some other office, or as to officers in other parts of the state, who were exercising certain judicial powers *ex officio* at the time of the adoption of the constitution, there would still be much reason to doubt whether the framers of that instrument intended to deprive the legislature of the right or power to authorize an elective officer to do any *ex officio* act which was in its nature judicial; or whether the restriction contained in the seventh section of the fourth article, was not intended to be confined to *the actual appointment to office of that class of [ *33 ] magistrates who were judicial officers in the ordinary and popular meaning of those terms. No such question as that, however, arises in the case under consideration. For at the time of the adoption of the constitution of 1821, the mayor and aldermen of the city of New-York, and the same class of officers in several other cities of the state, were in the legal and actual exercise of all or nearly all the judicial powers which they now claim the right to exercise under their respective charters or under any statutory provision. And the constitutional provisions which the attorney general relies on to sustain this information, must be construed not only in reference to provisions contained in other parts of the constitution itself, but also with reference to the various institutions which were existing at the time of the adoption of this fundamental law for the future regulation of the government of the state.

The adoption of a new constitution by a political body already organized and established is not, as was contended in this case, a bloodless revolution, which is to sweep away all existing institutions whose continuance is not expressly provided for in the constitution itself. On the contrary, it leaves all existing institutions and officers not expressly abolished and the continuance of which is not inconsistent with the letter or the spirit of such new constitution in the same state in which it found them, subject, however, to the

regulation and control of future legislation, so far as such legislation is not inconsistent with the provisions of the new constitution, as the paramount law.

The general provision in the constitution that all judicial officers, except justices of the peace in towns, shall be appointed by the governor and senate, is undoubtedly broad enough in its terms to apply to mayors and aldermen of cities, who from time immemorial have exercised many powers and duties which were strictly judicial in their character; and as the object of that clause of the constitution was not to define or limit the powers of any class of judicial officers, but merely to provide for the mode of appointment, this part of the constitution might perhaps have borne the construction that the mayors and aldermen to whom such judicial *powers pertained should thereafter be appointed by the governor and senate, in conformity with the directions contained in that section, had not other sections of the constitution provided for the appointment of the two classes of judicial officers in a different way. It will be seen, however, by referring to the tenth section of the fourth article of the constitution, and to the fifteenth section of the same article, that the framers of that instrument intended to provide for the appointment of these two classes of judical officers in a different manner than by the governor and senate. The *tenth* section directs the mayor to be appointed by the common council of the city; and the *fifteenth* section is equally explicit that " all officers heretofore elective by the people shall continue to be elected."

[ *34 ]

It was admitted upon the argument that the elective constitutional judges of *this court* necessarily formed an exception to the rule that all judicial officers were to be appointed by the governor and senate. But the counsel for the prosecution put that exception upon the ground that the constitution had *in terms* conferred judical powers upon the lieutenant governor and the senators, although they were elective officers. I apprehend, however, that the section of the constitution which provides for the appointment of all judicial officers by the governor and senate, not only excepts or excludes the thirty-three elective judges of this court, but that it also excepts from its operation every other judicial officer whose election or appointment is otherwise provided for by that constitution; and that this provision was not intended to strip every officer in the state who was not appointed by the governor and senate, of all the judicial powers which he had previously possessed and exercised *by virtue of his office.*

Any other construction would render some of the provisions of the constitution entirely nugatory. For instance: the special justices and the assistant justices in the city of New York had no other powers or duties conferred upon them by law, at the time of the adoption of the constitution, but such as were strictly judicial. They are, however, required by the constitution to be

appointed by the common council of the city, and there is no constitutional provision conferring upon *those officers any powers or [ *35 ] duties whatever. If, therefore, the section of the constitution so often alluded to should be construed to strip officers who are not appointed by the governor and senate of all the judicial powers they had previously possessed, and to deprive the legislature of the right to confer upon them any such powers for the future, these special justices and assistant justices, whose appointment is expressly provided for by the *fourteenth* section of the *fourth* article, would be left without jurisdiction or power of any kind. Surely no one will contend for a construction of the clause of the constitution in question, which must necessarily lead to such an absurdity in reference to the judicial powers of the officers specified in the fourteenth section, and yet I have not been able to discover any good reason for supposing that the framers of the constitution intended to leave the preexisting judicial powers of those officers untouched by the operation of the seventh section, which does not apply with equal force to the pre-existing judicial powers of the mayors and aldermen of cities : whose appointments and elections are also particularly provided for in the tenth and fifteenth sections of the same article of the constitution.

It is not alleged in this case that the legislature has attempted to confer any new judicial powers upon the mayor and aldermen of New-York, which those officers did not actually and rightfully possess at the time of the adoption of the new constitution, or that the defendants have been guilty of obtruding themselves into any new judicial offices, or of exercising new judicial powers, which their predecessors in the offices of mayor and aldermen of the city of New-York were not legally authorized to hold and exercise previous to that time.

The judicial powers conferred upon the mayor and aldermen of New-York by the charters of the city and confirmed by subsequent statutes, and which are now exercised by the same class of officers in other cities of the state, are not judicial powers of modern creation. Even in the city of New-York, the principal rights of whose officers are now for the first time called in question by this *quo warranto*, the mayor and aldermen have exercised very extensive judicial powers, *of the same charac- [ *36 ] ter, for more than a century and a half; and in that country to which we are indebted for most of our legal institutions, and from the representative of whose sovereign the charter of the city itself was originally obtained similar judicial powers, which have been conferred upon and exercised by the mayors and aldermen of cities, are traceable back at least to the commencement of the time of legal memory, or the beginning of the reign of Richard the First. In 1189, the same year that he ascended the throne of England, that monarch took from the port-reeve of London all the judicial

and other powers which that officer had previously possessed as the head of that city and county corporate, and committed them to two city prefects under the Norman title bayliffs; and shortly afterwards committed the same powers to a new officer under his present title of *mayor*. *Ealdorman* or *alderman* was also the title of a judicial officer of the county courts, as well as of the borough and city courts, under the Anglo-Saxon dynasty. This may be seen by referring to the apograph or transcript of a Saxon record of a judicial proceeding in a *shire-gemoot* at Alyston, in Hertfordshire, in the time of Canute the Great: the substance of which record is stated by Turner in the seventh chapter of his History of the Laws of the Anglo-Saxons. *Turner's Ang. Sax. vol.* 2, *p.* 527. And by referring to *Hughson's Privileges of the City of London*, it will be seen that all or nearly all of the judicial powers conferred by the statutes of this state upon the mayors and aldermen of our cities, as justices of oyer and terminer, judges of mayors' courts and other courts of record, and as justices of the peace are substantially the same powers as those which had been conferred upon the mayor and aldermen of London previous to the revolution, as elective magistrates of that city and county corporate.

The charter of New-York, granted by Governor Dongan, in 1686, did not embrace the whole county of New-York, as organized by the acts of 1683 and 1691. It only covered Manhattan Island; and did not include the several small islands and the adjacent waters, which also formed a part of the county. The grant of judicial power in that charter was of course [ *37 ] less extensive than it was in the subsequent grant *of 1730. It is possible, therefore, that a county court may originally have been established in that county under the ordinance of the 15th of May 1699; but if any such court ever existed, it was necessarily abolished by the subsequent charter in the fourth year of the reign of George the Second: the limits of which charter were co-extensive with those of the county. For more than one hundred years, then, previous to the adoption of the new constitution, New-York had, like London, been a county corporate as well as a city; having a separate local judiciary and magistracy, most of whom were elective and holding their offices by a different tenure from that of the judicial officers of other counties. This last charter, in addition to the former judicial powers of the local magistracy, contained also an express grant of the privilege that the mayor, recorder and aldermen for the time being, should forever thereafter be justices of oyer and terminer and jail delivery for that city and county, should be named in every commission thereof; and the provisions of these several grants of judicial powers had been strictly adhered to down to the time of the adoption of the constitution of 1777. That constitution, like the present, contained a provision that all officers theretofore eligible by the people should continue to be so eligible in the manner which

might be directed by the legislature. The aldermen of New-York, and of other cities in the state, under that provision of the constitution, continued to be elective judicial officers from that time to the adoption of the constitution of 1821; and all their judicial rights and powers were continued in the three several revisions of the laws which took place previous to that period; though such powers were from time to time somewhat extended by statute. But the mayors and and recorders of cities, who had been appointed by the colonial governor and his council prior to the revolution, were subsequently appointed by the governor with the consent of the council of appointment, under the general clause of the constitution to that effect.

The act of February, 1821, which was passed upon the application of the common council of New-York, changing the name of the *mayor's court* of that city to that of * *"the court of common pleas* for the    [ *38 ] . city and county of New-York," and providing for the appointment of an additional judicial officer, did not change the nature and character of the other judicial officers who were associated with him as judges of that court; but they were still authorized to hold the court in his absence, or with him when he was present, as they had before that time been authorized to do in reference to the same court under a different name. The aldermen under that act continued to be, and were at the time of the adoption of the new constitution, *elective judicial officers* of that court, and of the several other courts in the city and county corporate of New-York; and I have no doubt that the continuance of their offices as such was intended to be provided for under the clause of the constitution, which declared that all officers theretofore elective by the people should continue to be so elected. There is also as little doubt that the same clause of the constitution applies to that *class of officers* generally, so as to protect the aldermen of other cities of the state which have since been incorporated, the exercise of judicial duties conferred upon them by statute, similar to those which were exercised by the same class of elective officers at the time of the adoption of the constitutions of 1777 and of 1821.

Again: if the meaning of the several clauses of the constitution, which are under consideration in this case, were doubtful, the contemporaneous exposition which was given to them by the legislature would be entitled to great weight in fixing their construction. *See Stuart v. Laird*, 1 *Cranch*, 309. In the judiciary act of 1823, passed at the first session of the legislature after this part of the constitution went into effect, the mayors and aldermen, not only of New-York, but of every other city in the state, were associated with the circuit judges, and made judges of oyer and terminer of the several counties in which such cities were located. *Statutes of* 1823, *p.* 211, § 9. Even the aldermen of the city of Schenectady were included in that provision, though †I believe they had never before been

38      CASES IN THE COURT OF ERRORS

Albany, December, 1840.—The People v. The Mayor and Aldermen of New-York.

judges of oyer and terminer. This legislative construction was followed by the revisers, and by the legislatures of 1827 and 1828, by whom *the revision was made, not only in the organization of the courts of oyer and terminer and common pleas and general sessions in New-York, but also in reference to the oyer and terminer and courts of sessions and mayors' courts in other cities ; and by conferring various other judicial powers on mayors and aldermen, who were not appointed by the governor and senate. Indeed, scarcely a session of the legislature has been held since that time, at which some act has not been passed which was inconsistent with the construction of the constitution now insisted upon by the counsel for the plaintiffs in error. At the very last session of the legislature, even after this information had been filed by the attorney general, a law was passed giving to the mayor and any two aldermen of one of our cities, in the absence of the recorder, power to hold a criminal court, for the trial of all offences cognizable in a court of general sessions of the peace. *See statutes of* 1840, *p.* 199, § 9.

[ *39 ]

The section of the constitution fixing the term of office of judges of the county courts at five years, must necessarily be resticted to those officers who are appointed directly to the office of a judge of the county courts. It cannot properly be extended to that class of officers who are *ex officio* judges of the court of common pleas or general sessions of the peace in consequence of their election or appointment to an office embracing other duties, under the provisions of the constitution.

It is not necessary to consider the question here whether the legislature can assign to any new officer, *ex officio*, the discharge of the duties of a judge of a county court, as was done by the act of April, 1818, in the case of the mayor of Schenectady. Here no new *ex officio* power or duty has been conferred upon the mayor or aldermen of New-York, as judges of either of the courts in that city, since the adoption of the new constitution, which they did not hold or possess as such officers previous to that time.

In the view I have taken of the questions presented for our consideration, in this case, I cannot discover that these defendants have usurped any office, or attempted to exercise any official power or duty which did not legally and constitutionally *belong or appertain to them, by virtue of their election to the offices of mayor and aldermen of New-York. I did not suppose there could possibly be two opinions among the law members of this court upon the question presented by this writ of error, until I found the contrary to be the case during the argument here.

[ *40 ]

Being myself perfectly satisfied that the statutes of the state declaring the mayor and aldermen of New-York to be judges of the county courts of that city and county, were not passed by the legislature in violation of the constitution, I shall vote to affirm the judgment of the supreme court.

Albany, December, 1840.—The People v. The Mayor and Aldermen of New-York.

*By Senator* DIXON. It is conceded that the defendants were regularly elected to the offices of mayor and aldermen, and legally qualified and installed as such ; and that as far as the legislature was competent to that end, the statutes of this state, 2 *R. S., p.* 204, 215, 216 *and* 223, have clothed them with all the judicial powers which they claim. The attorney general, however, maintains that these statutory provisions must yield to the paramount authority of the constitution, and that the defendants, are not such judges, inasmuch as they are appointed by the governor, and do not hold their offices for the constitutional term.

The seventh section of the fourth article of the constitution provides that " the governor shall nominate by message, in writing, and with the consent of the senate shall appoint, all judicial officers, except justices of the peace ;" and the sixth section of the fifth article provides that " *judges of the county court* shall hold their offices for five years," subject to removal, &c. Can the defendants rightfully hold the offices of *judges of the county courts,* having been elected by the people, and not appointed by the governor, and holding their offices for one year only, and not for five ?

Since the defendants claim to hold for a less time than the constitutional term, and as the greater, includes the less, it might at first blush, seem unnecessary to push this point ; but without stopping to inquire whether it was not an object with the framers of the constitution to give more efficiency and stability to the administration of justice, than would be likely [ *41 ] to result from a bench filled with new judges once a year, a moment's reflection shows us that the necessary operation of an annual appointment is to eject those from office whose constitutional term of five years has not expired. The defendants point us to the annual election as the source of their authority to act as judges, and they cannot at the same time require us to presume that their immediate predecessors, who derived office from the same source, had held their offices for five years. Granting, then, for this branch of the argument, that judges of the county courts may be elected by the people, yet the defendants are usurpers, inasmuch as they assume the functions of an office which belongs to their predecessors, who still remain in full power, unless there be something in the case which exempts them from the constitutional provision requiring judges of the county courts *to hold their offices for five years.*

The defendants say that they find such exemption in usage, ancient charters, and in the colonial and state laws. I will not here make special reference to these several sources of power. I have already said that so far as legislative authority goes, it fully sustains the defendants. This remark is, however, subject to an exception, which I will notice hereafter.

I believe it is not seriously insisted that the people in primary assembly, convened for the purpose of settling the landmarks of their government, and

establishing for themselves fundamental rules for future action, are not supreme in power, restricted only by the law of God and the laws of nations; or in lieu of the latter, in our case, the constitution of the United States. This proposition is too clearly true to require argument to establish it. I shall therefore take it for granted, that every right, privilege, custom, franchise and immunity, held and enjoyed by the inhabitants of the city of New-York, from whatever source derived, as well as those of the state, by the adoption of the constitution of 1821, so far as the same were repugnant to, or not in accordance with it, were abrogated, unless expressly reserved. There is in the fourteenth section of the seventh *article [ *42 ] a reservation of certain *grants* or *charters* to bodies politic and corporate. But this exception, especially when read in connection with the preceding section, obviously operates only upon *private grants*, and such matters as were not under the control of legislative authority, and has no bearing upon the distribution of political powers. Any other construction would bring this section into irreconcilable conflict with many other parts of the same instrument; among which I will cite only the eighth, ninth, tenth, eleventh, thirteenth and fourteenth sections of the fourth article, making material alterations in the appointment and tenure of office in the most important offices in the city of New-York. The defendants' claim can, therefore, rest upon nothing antecedent to the constitution.

Who then are *judges of the county courts*, within the meaning of the sixth section above mentioned ? If this question were now for the first time propounded in this court, I am persuaded it would meet a prompt and uniform answer from every member—that they are no other than the *judges of the courts of common pleas* in the several counties of this state. If, as the supreme court think, in *The People* v. *Albany C. P.*, 19 *Wendell* 27, the denomination "*county courts*" embraces the courts of *general sessions of the peace*, as well as *courts of common pleas ;* and if, as the same court think in the case under review, the denomination "*judges of the county courts*," means all those persons who are authorized by law to sit in either of those courts in the several counties of this state, why have not *justices of the peace* been held competent to discharge the powers and duties devolved upon that class of officers ? *Judges of the county courts* are jointly authorized to hear and determine complants against physicians, 1. *R. S.* 449 ; to act in the appointment and removal of county treasurers, 3 *R. S.* 376, and in some other matters ; and they are severally authorized to act as commissioners of deeds, 1 *R. S.* 92 ; to take affidavits to be read in courts of record, 2 *R. S.* 213 ; to act on complaints of forcible entry and detainer *id.* 418 ; and in a summary manner to remove tenants in certain cases, *id.* 422. Yet [ *43 ] who ever surmised that justices of the peace were competent *to any of these powers ? But if the construction of the supreme

court is to prevail, they are equally competent as the judges of the courts of common pleas.

It is true that every county in the state has within it a variety of courts, which in some sense may be denominated *county courts* : such are the circuit courts, held by a justice of the supreme court, or circuit judge ; courts of oyer and terminer, held by the same, and two or more of the " *county judges,*" (who may be justices of the peace, if the above construction is to prevail :) courts of general sessions of the peace, held by the " *county judges,*" or any three of them, or in default of that number, the deficiency to be made up by one or more justices of the peace of the same county, so that there be at least one judge, and not more than five members upon the bench. If we are to apply the term judges of the *county courts* indifferently to the *judges of the court of common pleas*, and to *justices of the peace*, this last provision would make most extraordinary reading, and I commend it to the particular attention of the defendants. All these courts, beside the court of common pleas are required by law, to be held statedly at the court houses, in the several counties in this state, and may for that reason be denominated county courts. Besides these, every county has a variety of less considerable and more desultory courts : as justices' courts, and courts of special sessions, held by justices of the peace, whose jurisdiction for most purposes is co-extensive with the county ; surrogate's courts and courts held by sheriffs and coroners ; all these are in some sense county courts. All these magistrates, however, have their appropriate names, and none of them are known in the law or in common parlance, as county judges, or " *as judges of the county courts,*" except those persons commissioned to hold the *courts of common pleas*. This has been so ever since we had a state government. In the constitution of 1777, by section 24, it is provided, that the " first judge of the *county court* of every county, hold his office during good behavior, &c. The 25th section of the same instrument provides, that " the first judge of the *county courts* in the several counties shall not at the same time, hold any other office except," &c. *The 28th section, provides that " new commissions shall be    [ *44 ] issued to *judges of the county courts*, other than the first judge, and to justices of the peace, once at least in every three years." The 7th section of the 4th article of the constitution of 1821, has these words : " every person appointed a justice of the peace shall hold his office for four years, unless removed by the *county court*, for causes particularly assigned by *the judges of the said court.*" Here we cannot but observe, that the constitution uses the singular number, " *the county court,*" designating a particular court in each county, as notoriously pre-eminent and bearing that name, and designating the magistrates who hold it, as " *the judges of the said court.*" To the same effect in the quotation above made, the old con-

stitution speaks of " the first judge of *the county court* of every county." In the act to regulate the practice of medicine, " the judges of *the county court* are authorized to hear and determine charges against any physician." 1 *R. S.* 453. So in the act for the appointment of commissioners of deeds, " *the judges of the county court*," are required to determine by rule of court, &c. 1 *R. S.* 92. All these passages were overlooked by the learned judge, who delivered the opinion of the court in this case, when he says, " with two exceptions," 1 *Van Shaack* 196, § 7, *and stat.* 1821, 64 § 1. I have not noticed any statute passed either before or since the revolution which speaks even incidentally of the " county court."

The fourth article of the constitution of 1821, § 9, provides, that district attorneys shall be appointed, and may be removed by *the county courts.* I am aware that this clause of the constitution has met with a construction at the hands of the supreme court in *The People* vs. *Albany C. P.* 19 *Wen.* 27. The principal question mooted was, whether *county courts* in this clause, embraced more than one, and what court or courts : and the result was, that it meant the courts of common pleas and general sessions. The learned judge who delivered the opinion in that case said, " The obscurity of the clause in question in this instrument, arises out of the fact, that certain powers have been conferred upon the *county courts*, not [ *45 ] upon the *judges* of the county courts." A little *farther on, he says, if the legislative construction of this section, 1 *R. S.* 108, § 15, making *county courts* equivalent to *judges of the county courts*, " be the true interpretation, it would avoid all difficulty." " If thrown upon them (the judges,) then all of them, the five judges must meet and consult, though a majority may make the appointment." What judges were here spoken of ? Why beyond all doubt the first judge and his four associates, who ever since we have had a state government, have been appointed in each county, except the city and county of New-York, to hold the *courts of common pleas* therein, and who have ever been and still are known indifferently by the names, *judges of the court of common pleas, county judges*, and *judges of the county courts.* This last denomination is probably the most common in legislative and popular use, and is the one adopted by the constitution, providing that *they* shall hold their offices for five years. Had this reasoning been applied to the case before us, there would have been an end to it. The whole matter would have been brought to an easy and safe conclusion. If *judges of the county courts* was a phrase so definite and satisfactory as " to avoid all difficulty" in that case, why should so much doubt and uncertainty rest upon it here ? The only doubt in that case was, what was meant by *county court ;* there was none as to who were *the judges of the county courts.* This is the doctrine maintained by the people in this case, and all that is needed to entitle them to judgment: for conceding the

correctness of the rule, that the same word or phrase may be construed differently in different parts of the same instrument, according to the subject matter in hand; if *judges of the county courts* as connected with the appointment and removal of district attorneys, means *judges of the court of common pleas,* then *a fortiori,* should the same designation mean the same thing, when used in the abstract, and merely for the purpose of declaring the tenure of office ? District attorneys are officers of courts having criminal jurisdiction, and not of the court of common pleas, and there is fitness and analogy in permitting courts to appoint and remove their own officers; and while in the case alluded to, this *was the prevailing [ *46 ] consideration which led the court to the conclusion, that the *general sessions* was embraced by the term, in that instance, it is not easy to see why the court of oyer and terminer was not included also. Yet I am not inclined to find fault with that decision. It is sufficient for our present purpose, that it shows that at that time, *judges of the county court* was a term of no equivocal import.

It is true, that neither of the constitutions adopted by this state, attempted to organize county courts, except so far as to regulate the tenure of office and mode of appointment of the judges. They found county courts in full operation, and as they had heretofore been found useful, they evidently contemplated a necessity for them in all future time. The framers of both constitutions contented themselves with providing judges for those courts, and trusted to the legislature the definition of their powers. They knew that the judiciary was one of the grand pillars upon which the great edifice, they were engaged in erecting, must depend for stability and usefulness. In view of the importance of a faithful and able administration of justice, while they made most officers elective by the people, they thought proper to hedge about the principal altars of justice, and defend them from the fluctuations incident to popular elections, and to give to them a degree of stability and permanency. It is observable, that the degree of permanency was in proportion to the dignity and importance of the courts : Thus chancellors and judges of the supreme court were to hold their offices to a period when it was supposed that the infirmities of age would disqualify them for their duties, and the term of office for county judges was fixed at five years, and for justices of the peace at four. The amendment making justices elective, retains the term of four years. No constitutional provision in this state has ever placed a judicial officer of *any grade,* on so sandy a foundation as an annual election.

It is supposed, that because the constitution did not organize the county courts, by which I suppose is meant, declaring their jurisdiction, number of judges and terms, that it was competent for the legislature to erect as many *county courts* as it pleased, and with such jurisdiction and tenure

[ *47 ]     of *office as it should think proper, and that the "*judges of the county courts*" provided by the constitution, might or might not be employed in holding such courts at the option of the legislature. Novel and extraordinary as this proposition may seem, it is that upon which the court repose, and without which, as it appears to me, this judgment cannot stand. It therefore deserves particular attention. Let us examine it a little in detail.

Suppose the legislature of 1822, to whom the people handed over their new constitution to be carried into effect, had been dissatisfied with its provisions in relation to county courts, and had undertaken to improve upon the plan, by putting these courts into the hands of judges, appointed by joint ballot of the two houses, and to hold during pleasure ? Or suppose, that after organizing the courts of common pleas by declaring their jurisdiction, terms, &c. the legislature had made a law, declaring the supervisors in each county to be judges of the county courts, and requiring them to hold the court of common pleas in conjunction with, or exclusion of, the *judges of the county courts*, provided by the constitution : and that the commissioners of highways should hold the general sessions of the peace ? If such laws would be valid, then indeed is the constitution a shadow without substance, words without meaning—a man of straw upon the watchtower of freedom ; and all our confidence in it as a bulwark against legislative encroachments or waywardness is an idle dream. Yet how would such laws differ in principle from those which declare, " *the mayor and aldermen of the city and county of New-York, to be judges of the court of common pleas in and for the city and county of New-York ?*" If there be a difference, it must be found in something which distinguishes the city and county of New-York, from the other counties in the state., I have already discussed this point summarily, but inasmuch as it is a controlling one in the case, perhaps it ought to be examined a little more minutely.

The courts of the city of New-York had their origin in royal grants from the British crown, the last of which bears date in 1730. From [ *48 ]     that time up to the period of *the revolution, these courts were at the instance of the corporation, the subject of frequent modification by the colonial legislature. In 1777, the first state constitution was formed. In this, the *city courts* were recognized and sanctioned without any material alterations. From that time up to the year 1822, these courts were the subject of frequent state legislation, until in the language of Chancellor Kent, by a series of affirmative, cumulative and other statutory regulations, their original organization and character became entirely changed, although they still remained municipal courts and retained their original names. In 1821, *statutes of that year*, *p.* 64, was passed the act which provided " that the court of common pleas, called the *mayor's court*, of the

said city shall be, from and after the first day of April next, the *court of common pleas* or *county court* of the city and county of New-York," &c. This, by the bye, being one of several instances in which we have the sanction of the legislature to the proposition, that *common pleas* and *county court* are synonymous, and used indifferently for each other. The preamble to this act, shows that it was passed on the petition of the mayor, aldermen and commonalty, and this act for the first time established county courts *by name* in the city of New-York, and the *new* courts of common pleas and general sessions of the peace, by a new organization as well as a new name, effectually superseded the old ; and all former grants and legislation on the subject were substantially merged. By these acts of legislation, the corporation should be concluded : 1st. Because they were passed at their instance, which makes them binding in the nature of contracts or estoppels. 2d. Because they are the distribution of *judicial* and other political powers which are not the subjects of vested rights or individual or corporate property, except temporarily, and always remain at the disposal of the state. When, therefore, the new constitution was set in motion, it met with no peculiar obstacles in the city of New-York. It did not find its way blocked up by vested rights and royal charters. It there and in every county, found county courts in operation under the old constitution and subsequent statutes. It virtually said to the *legislature, go and   [ *49 ] enjoy your subordinate courts as heretofore, or remodel them at

pleasure, with this restriction only : whether you continue the old, or form new courts, their course of proceeding must be according to the common law, and they must be held by magistrates, (other than justices of the peace,) appointed by the governor and senate, and whatever *county courts* you establish, must be held by judges whose term of office is *five years* The city and county of New-York has thus far held off, claiming the privilege of electing 'a portion of her county judges every year. Whether the constitution or this custom is to prevail, depends upon the result of this suit.

It is said that the doctrine maintained by this information runs counter to the construction given to the constitution of 1777, and the whole course of legislation under it ; and the statutes authorizing *assistant justices* to hold seats upon the bench of the common pleas, and *justices of the peace* to sit in courts of general sessions of the peace, are cited to prove this proposition. Abuses and misconstructions in fundamental law are not to prevail when discovered, merely because they are ancient. But what were the objections to those laws ? The old constitution provided that *judges of the county courts* and justices of the peace should be appointed by the council, and with the exception of the first judge, that they should receive new commissions once at least every three years. These are the only constitutional

provisions bearing on the point ; the mode of appointment and tenure of office being the same in the judges and justices, and assistant justices being what their name imports, a certain number of justices of the peace selected in each county to aid the courts of common pleas. These commissions, issued by the governor, in terms authorized them to sit as judges in the courts of common pleas, and the commissions of justices in like manner expressly made them judges of the court of general sessions. The justices and assistant justices, therefore, had every constitutional qualification of *judges* of the respective courts in which they sat. Where, then, is the analogy between the two cases ? There is none, unless it be found [ *50 ] in names. Now, the objection to the defendants acting *as judges of the county courts is not that they are *called* mayor and aldermen. If, like the justices and assistant justices under the old constitution, they were *commissioned as judges*, as the present constitution requires, and held their offices for five years, there could be no objection to their acting as such, although they continued to be called *mayor* and *aldermen*. Till they can show such commissions, the analogy fails, and with it, in my opinion, their title to the offices. I think the laws in question are unconstitutional and void, inasmuch as they attempt to throw the office of *judges of the county courts* upon a class of officers who are elected annually and cannot hold for the constitutional term.

Having arrived at this conclusion, it is unnecessary for me to pursue the other branch of the argument at great length. I cannot forbear, however, a slight notice of it. The inquiry is whether the defendants are *judicial officers*. If they *are*, they hold in violation of the seventh section of the constitution, inasmuch as they are not appointed by the governor, but elected by the people. The supreme court say that they are *not judicial* but *legislative* and *executive* officers with " certain *judicial powers* cast upon them." The word *mayor*, anciently *meyr*, comes from the British verb MIRET, *custodire, to guard* or *protect*, or from the old English word MAIER, *potestas*, power or authority. *See Tomlin's and Jacob's Law Dictionaries.* The word alderman is synonymous with seignior. *Id.* These derivations tend to show that the offices of mayor and aldermen were originally not merely in name, but in fact, *executive* and *legislative*, and not *judicial*. They were such as the necessities of a growing town first required. I think the history of the cities of this state will generally, if not uniformly show that their mayors and aldermen were not originally clothed with judicial powers. It is at a more advanced period of their population and business that the ordinary tribunals of justice are found inadequate to the discharge of all their duties. The excess must now be thrown some where, and in casting about for proper repositories, it has been thought meet in many instances (New-York being one) to cast it upon the mayor and al-

dermen as a body of good men already called together, although [ *51 ] *for different purposes, and to erect *them* into a court of justice.

They are not selected because they are any better qualified than other men of equal intelligence and probity, but because they are more easily erected into a court. Thus the circumstance of their having been elected mayor and aldermen already half moulded them into judges, so that apprentices can finish the job, when the entire work would have required a master's hand! Or without figure, can the legislature commission a body of men to hold a court of common pleas in and for the city of New-York, because those men happened to be elected mayor and aldermen of that city, when without such election, such commission must have come from the governor and senate? It cannot be supposed that laws having a prospective operation like those under consideration, professing to make judges in advance of all persons who should thereafter be elected mayor or aldermen, are more unexceptionable than a like law adapted to a particular case.

It appears to be conceded that the legislature could not now for the first time confer judicial powers upon an officer not appointed by the governor and senate, and, to my mind, by that concession the whole argument is yielded, for the constitution no more sanctioned the tenure by which the mayor and aldermen held their judicial powers at the time of its creation, than it did that by which the first judge in each county held his. If *aldermen* can hold on because they are not named in the constitution, so for the like reason may a *first judge* hold on to the age of sixty years.

Again: it is said that if the *mayor and aldermen* are *judicial officers* within the meaning of the seventh section, so are the governor, secretary of state, comptroller, treasurer, attorney general, surveyor general, senators, sheriffs, coroners, county clerks, commissioners of deeds and of highways, canal commissioners, fence viewers and members of courts martial. In common parlance, none of these are *judicial officers*. Most of them are especially provided for in the constitution, and not one of the residue is ever in common or technical language called *judicial*. The temporary duties of a member of a court martial, no more constitute a person a judicial officer than do those of an arbitrator. But that a judge of the court of *common pleas is not a judicial officer, because at the same time he [ *52 ] happen to hold another office; as supervisor, town clerk or alderman, is to me paradoxical.

The protection which the defendants seek from the fifteenth section of the fourth article, declaring that all officers theretofore elected by the people shall continue to be so, is illusory. Aldermen had been elected by the people, but *judges of the county courts* were by the old constitution appointed by the council. This argument stands upon the same groundless assumption as the last, to wit: *that judicial powers were inherent in the offices of*

*mayor and aldermen.* We have seen the converse of this to be true, and so the practice under the old charters and colonial laws admitted. In those days, mayors and aldermen did not claim a right to sit as judges in courts *by virtue of their appointment and election* to the offices of mayor and al- dermen *alone.* If they did not receive separate commissions, they were sworn as to each office distinctly, faithfully to perform the duties of mayor or aldermen, and also faithfully to perform the duties of a justice of the peace. *Kent's Notes,* 79 *and* 80. Now it appears by the case, that the defendants were sworn as mayor and aldermen, but it does not appear that they were sworn as *judges* or *justices;* yet they admit that they have acted and claim the right to act as *judges of the court of common pleas, and of the general sessions of the peace, in and for the city and county of New- York.* They make title not as *mayor and aldermen with certain judicial powers cast upon them,* but as *judges of the* "*courts,*" not only in fact, but in name. *Judges of county courts* are required to make and file their oaths of office with the clerks of the counties where they respectively reside. 1 *R. S.* 110. And if they enter upon the duties of their offices without first having taken such oaths, they are guilty of a misdemeanor, and their offices are forfeited. 1 *R. S.* 111. I think, therefore, the defendants are divest- ed under this law, conceding their appointments to have been valid.

In every aspect in which I can view this case, I consider the people en- titled to judgment, and that the judgment of the supreme court should be reversed.

[ *53 ]  *By Senator* EDWARDS. It is evident that the mayor and alder- men of the city of New-York were judges of the county courts of the city and county of New-York, at the time of the adoption of the constitu- tion of 1821, and had been so for a long time previous. This authority was conferred upon them by the charters of the city of 1686 and 1730, and the acts of the legislature of 1787, 1797, and 1821; and the important question before this court, appears to be whether the amended constitution of 1821, has abrogated or taken from them any of these powers.

It is contended on the part of the people, that the manner in which and the term for which the mayor and aldermen are *elected,* is not in conformity to the provisions of the constitution, providing for the appointment of judges of the *county court,* or *court of common pleas,* (which are synonymous,) and that therefore they cannot act in that capacity, and the attorney general principally relies upon the seventh section of the fourth article of the con- stitution, which declares that " the governor shall nominate, by message, in writing, and with the consent of the senate shall appoint *all judicial officers* except justices of the peace," &c., and upon the sixth section of the fifth article, which ordains that " judges of the county courts shall hold their

office for five years, but may be removed by the senate, on the recommendation of the governor, for causes to be stated in such recommendation.

The question then very naturally arises, whether, the mayor and aldermen, vested as they were with certain judicial powers, were such officers as the framers of the constitution had in view, when they declared the manner in which *all judicial officers* should be appointed. I cannot believe that under this general term, *all judicial officers*, they intended that every officer who should perform a judicial act should be thus appointed. I am inclined to believe, they intended to comprehend those who were appointed to judicial stations, and who in common parlance, were termed judicial officers. They must be presumed to have known that the mayor and aldermen were then authorized to perform certain judicial acts, because this authority was given to them by charter and the public acts of the legislature. Knowing this fact, therefore, had they designed to    [ *54 ] supersede that authority by the seventh section of the fourth article of the constitution, would they not have said so in express terms? would they have left it to a doubtful inference? As well might it be contended, that under the old constitution, the offices of mayor and aldermen were municipal offices, and that no acts of the legislature could authorize these officers to act as judges, because they were not appointed by the council of appointment, and did not hold their offices during good behavior.

But the framers of the constitution have not only not taken from them in express terms the power they then possessed to perform certain judicial acts, but it appears to me they intended to confirm that power. In the thirteenth section of the seventh article of the constitution, it is said " that all such acts of the legislature of this state, as are now in force, shall be and continue the law of this state, subject to such alterations as the legislature shall make concerning the same. But all such parts of the common law, and such of the said acts or parts thereof, as are repugnant to this constitution, are hereby abrogated." Now, unless the acts conferring judicial powers upon the mayor and aldermen are repugnant to the constitution, they are not void. It appears to me also, that the acts authorizing these officers to perform certain judicial acts, do not constitute them judicial officers within the meaning and intent of the constitution, and, therefore, the acts are not repugnant to the constitution, and consequently are not abrogated by it. These officers are as they were before the adoption of the constitution, *elective officers*, with certain judicial powers attached to their offices. By virtue of the authority given them, they had become *ex officio* judges of the county courts for the city and county of New-York ; and while legally vested with this authority as a part of the duties of their offices, the constitution comes in, and by the fifteenth section of the fourth article declares, that all officers heretofore elective by the people shall continue to be elected. What were

the offices of mayor and aldermen as theretofore elected by the people? They were not only officers of the police, but were vested with the powers of judges of the county courts of the city and county of New-York: [ *55 ] *and this was a constituent part of their offices. Is it possible that the framers of the constitution intended to reserve to the people the right to elect all such officers as theretofore were elective, and deprive the officers of a constituent part of the powers and duties of their offices? Having left the powers of these officers undefined, the fair inference is, that they designed to leave the office what it had been; possessing the like powers, and subject in like manner to legislative provisions. I cannot believe the framers of the constitution intended to reserve to the people the right to elect these officers and yet deprive the latter of one-half of their powers.

Again: The authority conferred upon these city officers to sit in these courts as members thereof was expressly given by the city charter, and constituted one of the important rights conferred upon the citizens of New-York by that instrument: to wit., the right to elect certain officers, who should have the power *ex officio* to perform certain judicial duties; and by the fourteenth section of the seventh article of the constitution, these rights are reserved. In this section it is expressly declared that nothing contained in the constitution shall annul any charters to bodies politic and corporate, made before the 14th day of October, 1775, or shall affect any such grants or charters since made by the state, or persons acting under its authority. How, therefore, can we say, that these city officers cannot act judicially as members of the courts of common pleas *ex officio*, without taking away an important charter right, which the framers of the constitution have declared shall not be affected? In my opinion, it is not possible to do so, without violating both the city charter and the constitution. If these views are correct, it is unnecessary to examine the sixth section of the fifth article of the constitution, limiting the term of judicial offices, as these officers are not embraced within its provisions. But the attorney general supposes he is borne out in his constructions of the constitution by the case of *The Commonwealth* v. *Collins*, 8 *Watts*, R. 340, and also by the opinion of Judge Story in an *ex parte* case in 1 *Gallison's R.* 341. The case of [*56 ] *The Commonwealth* v. *Collins*, forms no precedent binding on this court; *nor is its analogy to the case under review such as to entitle it to the weight of authority. The commission under which Collins claimed to hold his office as presiding judge, was granted subsequent to the adoption of the amended constitution of the state of *Pennsylvania*, which provided for the appointment and duration of the office he held: but as it was not granted according to any of its provisions, it was held void. Not so in this case, if I am right in considering the term " *all judicial officers*" as not embracing that class of elective officers who had previously been vest-

ed with certain judicial powers for a limited time, *ex officio;* and also, if I am right in the construction I have given to the saving clause of the constitution. Nor does the opinion, or rather *dictum* as it may more properly be termed, of judge Story, in *Gallison*, sustain the doctrine the attorney general is forced to contend for, to maintain the ground he assumes. He says, " although I am satisfied that the legislature may at will give or take away the jurisdiction of the circuit or district courts, yet I entertain extreme doubts whether the legislature can constitutionally impose upon a judge of the supreme court of the United States the authority or duty to hold a district court. There is a great difference in giving a new jurisdiction to a court of which a judge is a member, and appointing him *pro hac vice* to a new office; and I do not perceive any sound distinction between an appoint⁻ ment to a new office and an appointment to perform the duties of another office, while it remains a separate and distinct office." Here it is not contended on the part of the corporation, that the mayor and aldermen are appointed to a new office, or that they are appointed to perform the duties of another office while it remains separate and distinct; but it is contended that they had this power before the adoption of the constitution, and that it was an incident to their offices, as a part of the duties they were bound to perform; and the question is, whether the constitution has taken away those powers, and thereby rendered that portion of the charter of the city, and the several acts of the legislature regulating the jurisdiction of these officers, void; and also whether all the acts passed subsequently to the constitution regulating their *jurisdiction, are also void? When    [ *57 ] the opinion of judge Story is applied to these points, instead of strengthening the position taken by the attorney general, it will be found to militate against him; for he says expressly, that he is well satisfied that the legislature may at will give· or take away the jurisdiction of the circuit or district courts—clearly conceding that to regulate the jurisdiction of an officer is legitimately the subject of legislation. This I apprehend to be the true rule, in all cases where the constitution has not prescribed the jurisdiction of the officer in express terms. In the case under review, the mayor and aldermen were *ex officio* judges of the county courts for the time being. The constitution does not in *express terms* take from them powers, which then appertained to their offices; nor, in my view, does it do so by implication; nor does it any where prescribe the jurisdiction of the judges of the county courts. It has therefore left the subject of jurisdiction to the legislature, which may regulate it at its pleasure. Hence, I infer it may enlarge or limit the judicial power of the mayor and aldermen, as may be deemed expedient, subject however to the rights secured by the city charter; that the several acts of the legislature passed since the adoption of the amended constitution, affecting their jurisdiction, are valid; and that the mayor and

57          CASES IN THE COURT OF ERRORS

Albany, December, 1840.—The People v. The Mayor and Aldermen of New-York.

aldermen are not wrongfully exercising the powers conferred upon them, but are in the rightful and lawful exercise of their legitimate duties. I am, therefore, for affirming the judgment of the supreme court.

*By Senator* HULL. The only question in this case is, whether in virtue of their offices as mayor and aldermen, the defendants in error are legally judges of the county court for the city and county of New-York. In presenting my views upon this question, I do not intend, nor if I were able, do I deem it necessary, to follow the learned counsel who argued the cause through the various illustrations and arguments which they have brought to their aid.

[ *58 ] The case seems to me to turn upon a few plain principles upon which I feel it to be my duty to state briefly the reasons *which have brought me to the conclusion at which I have arrived. I do this, because upon a great constitutional question, like the present, I desire to stand responsible for no other opinions than such as have produced a deliberate conviction in my own mind as to the correct decision of the cause.

The seventh section of the fourth article of the constitution of this state provides, that the governor shall nominate by message, in writing, and with the consent of the senate shall appoint all judicial officers except justices of the peace, for whose appointment provision is made by an amendment subsequently adopted in due form, making them eligible by the people.

This amendment, it is conceded, applies only to justices of the peace in all the counties, except the city and county of New-York, who are the only *elective judicial officers* contemplated by the constitution, if we except the lieutenant governor and senators, who, by another provision of the constitution, *art.* 5, § 1, are *constituted judges* of the court for the trial of impeachments and the correction of errors. Under this provision, then, standing alone, it seems very plain, that judicial officers claiming to hold by any other tenure than an appointment by the governor and senate, do so in violation of the express language of the constitution, as well as of the spirit of that instrument, which in making out the three great departments of government, contemplated that the independence of the judiciary, should be secured by being removed from the direct operation and fluctuation of the popular will.

If the case stopped here, it could not for a moment be contended, that the defendants, who it is admitted claim to be county judges, only *in virtue of their election* by the people of the city of New-York, to the offices of mayor and aldermen, could legally assert such a claim.

It is contended, however, that in virtue of their offices as mayor and aldermen, and notwithstanding the provision of the constitution above cited, they are entitled to act as judges of the county courts for the city and county of New-York, and that this right is placed upon the ground, among others, that

the mayor and aldermen of the city of New-York were *for more [ *59 ] than a century previous to the adoption of the new constitution, by virtue of the charter of the city and the laws of the colony, and subsequently of the state, judges of the courts in question, and that the constitution was not intended to, and did not, abrogate any of the powers which they thus exercised ; and further that it does not limit the exercise of judicial powers to officers appointed by the governor and senate, but merely provides for the appointment of a particular class of public officers by their name of office.

As it respects thé first branch of this proposition, that these officers were for more than a century previous to the adoption of the new constitution by virtue of the charter of the city, and the laws of the colony and state of New-York, judges of the county courts, it is undoubtedly true that the ancient charter of the city, and the subsequent legislation of the colony and state of New-York, did confer and continue the judicial powers now claimed for them. But in reference to the inviolability of the charter grant of these powers, to which reference was had upon the argument, and upon which some stress was laid, as respects the constitutional guarantee of their continuance, it may be well to observe, that the legislation on the subject previous, as well as subsequent to the new constitution, has entirely superseded the judicial powers conferred upon the mayor and aldermen by the charter, and that after a full consideration of the subject by chancellor Kent, in his notes upon the charter, *pages* 161, 162, 163 and 164, in which he reviews the charter provisions and the subsequent statutes, he concludes by observing: "Upon these statute foundations, and not on this section of the charter, now rest all the powers originally conferred by the section under review." This, if it were necessary, furnishes a conclusive answer to the position assumed on the part of the defendants in error, that the provision of the constitution, *art.* 7, § 14, that "nothing" therein "contained shall annul any charters to bodies politic and corporate," made by authority of the king or his predecessor, before the 14th of October, 1775, is applicable here, because it proves that at the time of the adoption of the new constitution, the provisions of the charter in reference to the subject under consideration were wholly *inoperative. But this answer is not neces- [ *60 ] sary. The powers contained in the charter so far as any argument is to be deducted from that instrument, in favor of the defendants in error, were a mere grant of *political powers*, which in a case referred to in *Kent's Notes on the Charter, page* 149, was held to constitute no vested right, but to be subject to legislative control. The case is thus stated : "The act of April 14th, 1832, Chap. 141, regulates the measuring of grain in this city, and directs the appointment of a measurer general and between ten and twenty measurers of grain. The act, so far, does away the corpo-

rate power in the charter, and declares that no person, except those appointed under the act, shall measure any grain in New-York for hire or reward. A question arose in the superior court of the city in the case of *Satterlee* vs. *Sutton*, whether the statute provision was sufficient to destroy the charter power on that subject, and to supersede a measurer appointed under the corporation. Ch. J. Jones, who delivered the opinion of the court held, that the grant to the corporation to appoint measurers, was a grant of political power, coupled with no interest, save the fees as a compensation for measuring ; and that the grant in question was not to be concidered in the light of property, or intended as a source of revenue, and that the legislative act was valid, and the grant in the charter so far controlled." And in a later case, decided in the supreme court of this state, *The People* vs. *Morris*, 12 *Wendell*, 325, the same principle was sanctioned. In that case a general act of the legislature forbidding the licensing of grocers to sell strong or spirituous liquors to be drank in their houses, and declaring the violation of such act a misdemeanor, was held to apply to incorporated cities and villages, whose charter it contravened, though granted previous to the passage of the law in question, upon the ground that *political powers* conferred upon a corporation for the local government of a place, are not vested rights as against the state, and may be abrogated by the legislature, as well by a general law affecting the whole state, as by a special act altering the powers of the corporation.

[ *61 ]     *It seems to me, that the true construction of this provision of the constitution is, that it was intended to protect only such rights conferred by the charter as could be properly regarded as *vested :* such as rights of property, and not to establish or perpetuate beyond the reach of legislative control, rights of a mere political character. " It is, (says Mr. Justice *Nelson*,) in the case *The People* vs. *Morris, p.* 331, an unsound and even absurd proposition, that ' political power conferred by the legislature, can become a vested right as against the government, any individuals or body of men. It is repugnant to the genius of our institutions, and the spirit and meaning of our constitution ; for by that fundamental law, all political rights not there defined, and taken out of the exercise of legislative discretion, were intended to be left subject to its regulation." Surely if this reasoning be correct, it cannot admit of question, that a reservation of chartered privileges by the constitution, must be so construed as to subject to its general operation, and place under the control of the representatives of the whole people, subject to its provisions, all questions of mere political right, though they be matters of mere local regulation.

But it has been said, that the provision of the constitution, *art.* 4, § 15, which declares that " all officers heretofore elective by the people shall continue to be elected," preserves to those officers all the powers with which

OF THE STATE OF NEW-YORK. 61

they were invested previously to the constitution. I admit that if the mayor and aldermen were previously to this provision, elective by the people, they must still continue so. But the mere fact that those officers are still to continue elective, cannot be considered as conferring upon or confirming to them, the judicial powers which they formerly exercised, against the express provision of the constitution, which confers the appointment of judicial officers upon the governor and senate. Those powers they formerly exercised, not as mayor or aldermen, but under statutory enactments, consistent with the constitution which then existed. All the powers which may be conferred upon them under the new constitution, must necessarily be subject to its other restrictions, one of which is, that *judicial   [ *62 ] officers are to be appointed in the manner prescribed by its express provisions.

Nor is there, in my judgment, any soundness in the distinction, that though judicial officers can be created only by an appointment by the governor and senate, yet judicial powers may be conferred upon other than judicial officers. This argument, if carried out, would lead to this result, that though the legislature cannot create judicial officers by name, who are to be appointed otherwise than by the governor and senate, yet they may delegate the right to exercise those powers to elective officers. As I construe the constitution the source of all judicial power, unless where an express exception has been made, which is not pretended in the present case, is an appointment by the governor and senate; and I hold that the conferring of judicial powers upon all not thus appointed, is in effect the creation of a judicial office contrary to the constitution.

The framers of that instrument, in distributing the various departments of government judged wisely, in making the judiciary permanent and independent of the sudden fluctuations of popular will; and the whole spirit of the provision incorporated in it for this purpose, might be evaded if this distinction contended for, between the *creation of judicial officers*, and the *conferring of judicial powers* could be sustained. I have carefully reflected upon this case, and am entirely satisfied, that the provision of the constitution giving the appointment of judicial officers exclusively to the governor and senate controls it; that there is nothing in any portion of that instrument, which either expressly or impliedly, excepts the mayor and aldermen of the city of New-York, so far as judicial powers are concerned, from its general operation; and that, as their claim to sit as *judges of the county court*, is founded solely upon their election as mayor and aldermen, the supreme court should have rendered judgment against the defendants in error.

I am therefore of opinion that the judgment of the supreme court should be reversed.

Albany, December, 1840.—The People v. The Mayor and Aldermen of New-York.

[ *63 ]    *By Senator ROOT. The question is whether the mayor and aldermen of the city of New-York, *elected by the people*, and holding their offices *only for the term of one year*, have a right to officiate as *judges* of the county courts of the county of New-York. *Blackstone* says a *court* is defined to be a place wherein justice is *judicially* administered; and that in every court there must be at least three constituent parts : the *actor*, *reus* and *judex*, and the latter term he defines to be *the judicial power*. The *constitution* of the state declares that "the governor shall nominate by message in writing, and with the consent of the senate, shall *appoint* all *judicial officers* except justices of the peace ;" and that the "*judges of the county courts* shall hold their offices for *five years*," subject to removal, &c. When these express terms of the fundamental law of the state are applied to the *claims* of the defendants to officiate as *judges of the county courts*, it seems to me no room is left for doubt, and that they must be declared unfounded. The mayor and aldermen are neither appointed by the governor, or do they hold their offices for *five years ;* they are *elected* by the people, and hold their offices for only *one year*. It is true, that the *legislature* have authorized them to officiate as judges of the county courts ; but no power to confer such authority is entrusted by the constitution to the legislature ; it is given to the *governor and senate*. The argument which has been urged, that the legislature have not conferred any offices in this respect, but have only designated certain municipal officers, who, by virtue of the offices held by them, shall be competent to preside in the county courts, is no answer to the objection that the legislature have not the power to appoint *judicial officers ;* it concedes that they *have not the power to appoint*, and consequently the universal principle of law, based on the soundest good sense, applies that what cannot be done *directly* cannot be done *indirectly*. I am, therefore, for reversing the judgment of the supreme court.

On the question being put, *Shall this judgment be reversed?* the members of the court voted as follows :

*In the affirmative :* Senators A. B. DICKINSON, DIXON, HAWKINS, HULL, HUNT, LEE, LIVINGSTON, PECK, ROOT, WORKS—10.

[ *64 ]    *In the negative :* The CHANCELLOR and Senators CLARK, EDWARDS, HUMPHREY, MOSELEY, PAIGE, SKINNER, TALLMADGE, VERPLANCK, WAGER—10.

Whereupon the judgment of the supreme court was AFFIRMED.