AT CHAMBERS    November 3, 1842.    Before *Reuben H. Walworth*, Chancellor of the state of New York.

## JOHN C. COLT *vs*. THE PEOPLE.

The court of Oyer and Terminer, in which a criminal case has been tried and verdict of guilty is given, ought not to delay the sentence for the purpose of having the decision reviewed by certiorari. except in cases of great doubt and difficul⁺y; in other cases, the defendant should be left to his writ of error.

Even in capital cases, it can seldom be necessary to delay the sentence, the governor being authorized in these cases to take the opinion of the attorney general and of all the high judicial officers of the state, before he permits the execution of the sentence, and to suspend the execution of the sentence, that the case may be brought before the Supreme Court and decided on a writ of error, if he or any of these officers entertains any doubt as to the legality of the conviction.

Writs of error in cases not capital, issue of course; but they do not stay the sentence, without an express order to that effect from a circuit judge, or a judge of the Supreme Court.

In capital cases, no writ of error can be issued unless allowed by the chancellor, or one of the justices of the Supreme Court, or a circuit judge upon notice given to the attorney general, or to the district attorney of the county in which the conviction was had; and it is the duty of the officer to whom the application is made, to disallow the same, if he has no reason to doubt the legality of the conviction.

Where at the Oyer and Terminer the initiatory proceedings of a trial for murder had been commenced, by calling the jurors as directed by law, and only nineteen of the jurors answered to their names, whereupon three hundred additional jurors were summoned by the sheriff under direction of the court, and the court refused to delay the trial for two or three days, as requested by the prisoner's counsel, to enable them to examine such list of additional jurors, it was held that the question to be decided on such application was a matter of discretion, and that no exception could lie to such refuasl.

*Held*, also, that the summoning of so large a number of additional jurors was a matter of sound discretion, to be exercised by the court, with a view to get a sufficient number who were qualified and competent, from which a full jury could be obtained; and that such discretion should be exercised, upon the knowledge which the court possessed, of the probable effects which a report of the facts, in the public papers and otherwise might have had, in biassing the minds of jurors, so as to disqualify them from serving on the trial.

Where on a trial at the Oyer and Terminer, the prisoner called as a witness a woman, by whom he proved that she was living with the prisoner as his

Colt v. The People.

mistress and not as his wife, so as to make her a competent witness in his behalf, and then proved, by her, facts deemed material in the case, and no attempt was made on the part of the public prosecutor to impeach her testimony, it was held that the prisoner was not at liberty to introduce testimony to sustain her character for truth and veracity. (a)

Where there is no evidence before the grand jury, or known to the prosecutor, at the time of finding the indictment for murder, to show what instrument was used to produce the mortal wound, it is proper to charge, in the indictment, that such wound was inflicted by some instrument to the jurors unknown; and under such an allegation, it is competent for the public prosecutor to introduce evidence to raise a presumption that the wound was caused by a pistol ball; and to prove, for that purpose, that the prisoner had pistols in his possession and that a ball, propelled by the explosion of a percussion cap, would be likely to produce such a wound; or to prove that the prisoner had such pistols, for the purpose of satisfying the jury, if possible, in connection with other evidence in the case, that the prisoner had taken the ramrod from the pistol and driven it into the head of the deceased.

The finding of the jury at the Oyer and Terminer upon a mere question of fact, can not be reviewed by the appellate court on a writ of error, although it appear affirmatively that the bill of exceptions contains all the testimony given on the trial.

The provision of the Revised Statutes, (2 R. S. 204, § 28,) authorizing the Mayor, Recorder and Aldermen of the city of New York, or two of them, to sit in the Oyer and Terminer held in that city, as a constituent part thereof, is not a violation of Art. IV, Sec. 7, of the state constitution in force at the time of its enactment.

This case came before Chancellor Walworth, in November, 1842, upon an application for the allowance of a writ of error to the court of Oyer and Terminer of the city and county of New York.

The applicant was indicted for the murder of Samuel Adams; and was tried and convicted at a court of Oyer and Terminer in the city and county of New York, composed of the circuit judge of the first circuit and two aldermen of that city, in January, 1842. After the verdict the sentence or judgment of the court was suspended for the purpose of obtaining the decision of the Supreme Court upon certain questions raised upon the trial. The case was accordingly brought before the Supreme Court by *certiorari*, as authorized by the revised

(a) See The People v. Gay, page 308, and S. C. 3 Selden, R. 378.

statutes, and some of the objections, or alleged grounds of error, raised and argued upon this application to the chancellor, were argued and disposed of upon that certiorari. The Supreme Court having ordered the proceedings to be remitted to the court of Oyer and Terminer, with directions to proceed and pass sentence upon the prisoner, final judgment was given against him accordingly.

The prisoner's counsel, wishing to carry the case before the court for the Correction of Errors, supposed it was necessary, to enable them to do so, first to bring the case again before the Supreme Court by writ of error, and have the judgment of the Oyer and Terminer affirmed there, and then to sue out another writ of error to the Supreme Court, returnable in the court for the Correction of Errors. They therefore applied, in the first place, to the circuit judge before whom the prisoner was tried, for the allowance of a writ of error, with a stay of proceedings. That application being denied, they applied to one of the justices of the Supreme Court at chambers, who with the concurrence of both of his associates on the bench, also denied the application; which was then renewed before the chancellor. On this application some new questions, particularly one as to the constitutionality of the organization of the court of Oyer and Terminer before which the prisoner was tried and convicted, which were not raised before the Supreme Court upon the certiorari, were raised by the counsel for the prisoner.

It appeared from the testimony in the case that Adams went to the room of the prisoner to obtain payment of a debt due from the latter; that a witness in an adjacent room heard a scuffling, and the noise of some heavy body falling on the floor, and looking through the key hole of the prisoner's door, which did not enable him to see within three or four feet from the floor, he discovered the prisoner stooping down, and doing something which caused his shoulders to raise and fall alternately. The body of the deceased had been put into a box by the prisoner and transported to one of the wharves of the city to be shipped to a distant place. And when found there was upon the head of the corpse the marks of one or more blows

with a hatchet or hammer; and a small round hole in the side of the head, leading directly to the brain, about the size of a pistol bullet, which it was found difficult to account for, as no report of a pistol was heard by the witness who was in the adjacent room. It appeared, however, by the testimony before the coroner and on the trial, that there was found in the prisoner's room, where the supposed murder was committed, one of Colonel Colt's revolvers which was not loaded, and a ram rod, which was detached therefrom, but fitting the bore of the revolver. A hammer hachet was also found in the prisoner's room. One count of the indictment, therefore, charged the murder to have been perpetrated with a hatchet; and another charged that it was done with some instrument to the jurors unknown. Under this last count the court, before which the prisoner was tried, allowed the public prosecutor to produce evidence tending to show that the round hole in the head of the deceased might have been produced by a pistol ball propelled from the revolver by the means of a percussion cap, or in some other way which would not cause an explosion sufficiently loud to be heard in the adjacent room. To the admission of this testimony, the prisoner's counsel excepted.

In the course of the trial it became necessary for the prisoner, as his counsel supposed, to introduce a witness with whom he was cohabiting at the time of the alleged murder, and to show that she was not his wife but his mistress, to show that she was a competent witness in his favor. Having examined her as a witness, his counsel offered testimony to prove that her general character for truth and veracity was good, notwithstanding she was living with him as his mistress. That testimony was objected to by the public prosecutor and overruled by the court.

The prisoner having pleaded not guilty to the indictment, on Monday the 17th of January, the clerk of the court proceeded to call the names of the persons on the panel of jurors returned for that court, preparatory to the drawing of the jury, for the trial of the prisoner. And twenty-four persons duly drawn and summoned to attend that court not having appeared, the court

under the provisions of the third section of the title of the revised statutes relative to the trial of offences, &c., ordered the sheriff to summon three hundred persons duly qualified to serve as jurors, to complete the number required by law, to attend on the next Wednesday morning, at ten o'clock; and all further proceedings were postponed until the time mentioned in that order. At that time the clerk was directed to call over the original panel of jurors, and only fifteen of them answered to their names. The prisoner's counsel then moved that they might be furnished with a copy of the list of the three hundred additional jurors summoned pursuant to the order of the court, and that two or three days' time should be granted to them to examine that list before the trial. The court refused to grant the postponement asked for, and directed the trial to proceed forthwith. The counsel of the prisoner thereupon challenged the array of the three hundred jurors so summoned; because so large a number had been ordered to be summoned; because only two days were allowed to the sheriff to execute the order of the court; because the sheriff had not furnished the prisoner's counsel with a list of the persons so summoned before the day of trial; and because the sheriff had obtained the names of such jurors by taking them from the list of grand and petit jurors returned to the county clerk's office as persons qualified to serve on juries. But the court decided the challenge was not sustainable on either of those grounds.

The objection to the organization of the court of Oyer and Terminer was that the aldermen, being elective officers, and not appointed by the governor and senate, could not constitutionally be judges of that court.

*Dudley Selden* and *David Graham*, for the applicant for a writ of error.

*James R. Whiting*, (Dist. Att'y,) for the people.

THE CHANCELLOR. — This is an application on the part of John C. Colt, who has been convicted of the crime of murder,

for the allowance of a writ of error to the court of Oyer and Terminer of the city and county of New York, to remove the record into the Supreme Court, and for a certificate that there is probable cause to stay the proceedings upon the judgment, which has been pronounced against the prisoner.

The questions arising upon the writ of error have already been before the Supreme Court, and were decided against the prisoner there; and the avowed object of his counsel is to carry his case ultimately to the court for the Correction of Errors. But they suppose that as the court of Oyer and Terminer stayed its judgment upon the verdict of the jury, and permitted the case to be carried before the Supreme Court *before sentence*, there is now no other way to get the case before the court of dernier resort, but by carrying it again before the Supreme Court by a writ of error; and after that court shall have affirmed the judgment, which has been given pursuant to the former direction of that court, to sue out a second writ of error, from the court of dernier resort, directed to the Supreme Court.

Provided the prisoner's counsel are right in supposing they can not now go directly to the Court of Errors, which I am inclined to think is the fact, and if a writ of error from the Supreme Court to the court of Oyer and Terminer will lie, in such a case, the prisoner's execution must necessarily be suspended until these forms of law are gone through with, in case of the allowance of this writ; should the governor think proper to suspend the execution of the sentence for that reason alone. But necessary delay, which the forms of law require, is no ground for refusing the writ, in a proper case. It only shows that the legislation which allowed criminal cases to be carried before the Supreme Court *before judgment*, was highly inexpedient; or that the court in which the prisoner is tried should not permit counsel to try experiments of that kind, by a delay of the sentence, except in cases of great doubt and difficulty.

Indeed, even in capital cases, it can seldom be necessary thus to delay the *sentence;* for the governor is authorized to

Colt v. The People.

take the opinion of the attorney general, and of all the high judicial officers of the state, in such cases, before he permits the execution of the sentence. And it would be almost a matter of course for him to suspend the execution of a sen-tence until the case could be brought before the Supreme Court, and decided upon a writ of error, if he or any of those officers entertained a doubt as to the legality of the conviction. And in cases not capital, the judges of the court who try the prisoner certainly ought not to stay the *sentence*, and burthen the county with the expense of supporting the convict until the case can be carried to the Supreme Court, when they have no doubt as to the correctness of the conviction, as the statute provides for a stay of proceedings *after sentence*, by the order of a justice of the Supreme Court or circuit judge.

Writs of error, in cases not capital, issue of course; but they do not stay the execution of the sentence, without an express order to that effect, from a circuit judge or a judge of the Su-preme Court. In capital cases, however, the law has provided that no writ of error shall be issued unless allowed by the chancellor, or one of the justices of the Supreme Court, or a circuit judge; upon notice given to the attorney general, or to the district attorney of the county where the conviction was had. This provision of the statute necessarily implies a duty, on the part of the officer to whom the application for the allow-ance of the writ is made, to disallow the same if he has no reason to doubt the legality of the conviction of the prisoner.

All the justices of the Supreme Court having declined to allow a writ of error in this case, and the application having now been renewed before me, and counsel having been heard at length thereon, I have carefully examined the whole testi-mony in the case, as well as the particular questions referred to by counsel on the argument as grounds of error, to see if there was any thing therein which could justify me in interfer-ing, by the allowance of this writ.

The first error relied upon relates to the organization of the Court of Oyer and Terminer, before which the prisoner was

tried, convicted and sentenced; the questions arising upon which point I shall consider after examining the objections to the decisions of the court upon the trial, which the counsel for the. prisoner have thought of sufficient importance to call my attention to on the argument.

The first objection raised at the trial was to the refusal of the court to delay the trial two or three days, after the initiatory proceedings had commenced, by calling the jurors as directed by law, to enable the prisoner's counsel to examine the new list of additional jurors summoned under the statute. This was a matter of discretion in the court, if the court was authorized to postpone the trial at all, after the commencement of the initiatory proceedings, by an attempt to get a jury in court for the trial of this particular case. And I am satisfied that discretion was not improperly exercised. The summoning so large a number of additional jurors was a matter of sound discretion, to be exercised by the court with a view to get a sufficient number who were qualified and competent to discharge the duty, from which a full jury could be obtained.

Such discretion must of course be exercised upon the knowledge which the court possessed out of the case, of the probable effects which a report of the facts in the public papers and otherwise might have had in biasing the minds of jurors so as to disqualify them from serving on the trial. And although the particular circumstances which operated upon the minds of the judges to induce them to order so large a number to be summoned can not appear upon the record, the result which does appear conclusively shows that the number ordered to be summoned was not unnecessarily large. For out of the nineteen jurors who answered to their names when the attempt to empannel the jury first commenced, and the additional three hundred summoned by the sheriff, but two hundred and twenty-five attended. Of these, twenty-seven were excused from serving, for legal causes, one hundred and sixty-nine were challenged for cause and were found to have made up their opinions upon the case, and eighteen more challenged pere nptorily by the prisoner. So that but eleven jurors were obtained from the

whole list, and it was still found necessary to award a tales to complete the jury.

The objection that the prisoner was not permitted to introduce testimony to sustain the character for truth and veracity of his own witness, Caroline Henshaw, who was not attempted to be impeached, is clearly untenable. The case of *People* v. *Rector*, (19 *Wend.* 569,) which is relied upon to sustain this objection, although it went farther than I before supposed the principle had ever been carried, is a very different one from this. Here the prisoner himself is compelled to call a witness and show that she is living with him as his mistress and not his wife, to render her competent, and to enable him to prove facts which he wished to get before the jury, and which could only be known to her from lodging with him. And no attempt is made on the part of the public prosecutor to impeach her testimony. It would certainly be a violation of all principle to permit the party calling a witness to introduce proof of general good character in such a case.

In Rector's case, the witness's particular bad character was drawn out upon his cross-examination, for the purpose of rendering him infamous, as he justly deserved to be, and thus discrediting him before the jury. On the contrary, in this case, the public prosecutor directly disavowed any intention to impeach the witness, and declared his belief to the jury that she had intended to testify truly. And I think no one who reads the testimony of this erring woman, however deeply she has sinned in another respect, can doubt that in this case she did not intend to add to her other moral offence the still deeper crime of perjury. For her testimony, while it proves little or nothing in favor of the prisoner, whom she had strong inducements to screen from punishment, if she believed him innocent, supplied very important links in the chain of evidence on the part of the public prosecutor.

Even upon the point upon which the prisoner's counsel supposes her testimony to be most material in favor of the prisoner, it appears to me it is generally against him. He made no complaint of the injury upon his neck or shoulder when he

came home late in the night succeeding the fatal encounter, nor did she then witness any attempt to conceal such a bruise. But the next day, after he had been seen lowering down the box with the edge of it against his shoulder, he went home and bathed his shoulder and neck in spirits and went to bed, and took pains to conceal the injury by pinning up his night shirt about his neck.

I think the circuit judge was right, according to the settled law, in allowing evidence to be given to raise a presumption that the small wound in the side of the head of the deceased was caused by a pistol ball, under either count of the indictment. As there was no evidence before the grand jury, or known to the prosecutor at the time of finding the indictment, to show with anything approaching to certainty, or even probability, what instrument was used to produce that wound, which, of itself, was sufficient to produce death, it was proper to charge in the indictment that a mortal wound was inflicted with some instrument to the jurors unknown. And under that count it was allowable to introduce the evidence that the prisoner had in his possession such pistols, and that a ball propelled by the explosion of a percussion cap would be likely to produce such a wound; or the public prosecutor, under that count, might have produced evidence of the prisoner's having in his possession such pistols, for the purpose of satisfying the jury if possible, that he had taken the ramrod from the pistol, when Wheeler saw him go to the table, and had driven it into this part of the head by a blow of the hatchet, while the deceased was lying senseless upon the floor.

If this wound could not have been made with the hatchet, and there had been proof that the pistols had a rammer corresponding with the size of the ball, I should suppose this a more probable supposition, in connection with the testimony of Wheeler, than that a pistol ball could have been shot through this part of the head with a mere percussion cap, and at so short a distance. The testimony of Dr. Rogers, however, is, that the corner of the hatchet's edge, if held by a person standing in front of the deceased while he was on his feet, exactly

fitted this hole in the skull, and as the skull and hatchet were placed together before the jury, they could, of course, see whether he was correct, as it required no surgical skill to see that the corner of the hatchet filled the hole with the handle toward the face.

As the statute uses the words " by accident and misfortune, and not done in a cruel or unusual manner," in defining excusable homicide, I do not see how any one can doubt the correctness of the judge's charge in telling the jury that those expressions were not to be rejected as surplusage for the purpose of bringing the case within the second subdivision of the fourth section of the statute on this subject.

In addition to the questions raised by the bill of exceptions, the counsel for the prisoner insists that as it is admitted by the public prosecutor that the bill of exceptions contained all the testimony, the court above, upon a writ of error, has the right to reexamine the finding of the jury upon matters of evidence under the provisions of the revised statutes, and to reverse the judgment, if the judges of the appellate court have any doubts, from the evidence, as to the guilt of the prisoner.

I have, therefore, carefully examined the whole testimony, in connection with the arguments of counsel upon the facts, for the purpose of satisfying myself whether there was any reason to doubt that this was a case of willful murder. But as I am satisfied upon a full examination of the provisions of the revised statutes, to which I was referred, that the decision of the jury upon a mere matter of fact can not be reviewed upon a writ of error, it is unnecessary that I should state the conclusion I have formed as to the prisoner's guilt or innocence, or the reasons upon which my opinion is based.

The objection as to the organization of the court involves the question whether there has been any court of Oyer and Terminer constitutionally organized in this city since the first of January, 1823, or whether every conviction in that court for the last twenty years has not been illegal and unconstitutional, except in one case, in which a special commission of Oyer and Terminer was issued. Indeed, it involves the question whether

any court of Oyer and Terminer can be held in this city, under the provisions of the revised statutes, without such a special commission to be issued by the governor with the advice and consent of the senate. For the courts of Oyer and Terminer in this city, by the provision of the revised statutes, (2 *R. S.* 204, § 28,) must be held by one or more justices of the Supreme Court, or of the circuit judges, or by the first judge of the Common Pleas, *together with* the mayor, recorder and aldermen of the city, or *with* two of them. That is, if all the justices of the Supreme Court, or all the circuit judges, were present on the bench, they could not hold a court without having also associated with them the mayor, recorder and aldermen, or at least two of those officers. And as the mayor as well as the aldermen is now elective, if none but those who are appointed by the governor and senate can act as justices of Oyer and Terminer, it follows, of course, that there is no law in force by which a court can be organized here, without calling the senate together to consent to the issuing of a special commission.

This does not show that the prisoner, or any other person who has been convicted in the Oyer and Terminer within the last twenty years in this city, if not already executed, may not still raise the constitutional question which is now agitated. But this long acquiescence in the construction of the constitution, renders it highly probable that the construction which was given to it upon the first organization of the government under it in 1823, and which construction has been also given at nearly every session of the legislature since that time, is most probably correct. Still if there is any reason to believe that the judgment in the present case will be reversed by the court for the Correction of Errors on that ground, and certainly if I have any reason to doubt whether the prisoner has or has not been convicted before a court organized in direct violation of a positive provision of the constitution, I can not refuse him the benefit of a writ of error, where I have the power to grant it. I therefore proceed to examine the grounds upon which his counsel suppose it probable that the judgment may be reversed on account of the supposed illegal organization of the court.

Colt *v.* The People.

In the case of *The People on the relation of the Attorney General* v. *Varian, the Mayor and certain Aldermen of the city of New York*, (25 *Wend. Rep.* 9,) which arose out of the trial of a justice in the court of common pleas for alleged misconduct, the question was brought before the Supreme Court, whether the mayor and aldermen, or either of them, could act as judges in the county court of that city. That court unanimously decided the constitutional question in favor of the mayor and aldermen. (25 *Wend. Rep.* 10, 26.) And the case being carried to the court for the Correction of Errors, the judgment of the Supreme Court was affirmed by a tie vote. Seven of the law members of that court voting in favor of the affirmance, and Messrs. Root, Dixon and Lee, who were also lawyers, voting for a reversal of the judgment of the court below.

It will be seen, however, by an examination of the opinions of Mr. Dixon and Gen. Root, that they placed their opinions upon two provisions of the constitution, the last of which has no application to this case; the first being the general provision as to the appointment of judicial officers, and the other being that which in express terms required judges of the county courts to be appointed for five years. And it is evident that Senator Dixon's opinion was mainly based upon this last clause of the constitution.

Senator Hull also, a most worthy and conscientious member of that court, who is not a lawyer, but who delivered a written opinion in favor of the reversal of the judgment of the supreme court, confines his remarks to the right of the mayor and aldermen to act as judges of the court of Common Pleas, in violation, as he supposed, of the constitution, and says nothing of their right to act as justices of the Oyer and Terminer. It is very doubtful, therefore, whether any considerable number of those who voted to reverse the judgment of the Supreme Court, would have given the same vote if the question had arisen as to the right of the mayor and aldermen to act as justices of Oyer and Terminer in this and other cities of the state, where the statutes have authorized them to act as such.

Again; the case of *The People* v. *White* (24 *Wend.* 520) was

Colt *v.* The People.

decided by the same court and at the same time; in which case the question as to the right of the aldermen to act as justices of Oyer and Terminer arose and had been argued by counsel. And in that case both General Root and Senator Dixon held that the fact that aldermen acted as justices of Oyer and Terminer upon the trial of the prisoner, was no ground for reversing the judgment. I think, therefore, that if the case was brought before the judges who decided the case first referred to, upon the question which the prisoner wishes to raise, as to the organization of the court, there is not the remotest probability that he would have succeeded in reversing this judgment, and there probably would not have been two votes in his favor on that ground. For the same and other reasons I do not think there is any probability that any considerable number of those who now are or hereafter may be members of that court, will vote to reverse a judgment on the ground that aldermen were associated with the circuit judge in the organization of the court of Oyer and Terminer, before which the prisoner was tried.

It is true I then did and do still differ in opinion with those who think a prisoner can not upon a writ of error avail himself of the objection that the law organizing the court before which he was tried and convicted, was unconstitutional; even if the judges of such a court would not themselves be liable to be punished criminally for directing their illegal sentence to be executed upon him. But I am much more confident that I am right in supposing there is not the least probability that the court of dernier resort, to which it is now sought to carry this case for review, will reverse the judgment on the ground that the court of Oyer and Terminer was not properly organized.

No one not immediately acquainted with the condemned individual whose case I have been considering, can more deeply regret than I do the situation in which he is placed, or sympathize more sincerely with his numerous connections. It has been my good fortune to be acquainted with many of them, and I know them to be among the most respectable in any commu

nity.  With one of them, a lady who is a very near relative, I have been on terms of intimacy and friendship for more than thirty years.  But in the administration of justice, upon which not only the safety of the community, but all that is dear in life depends, the calls of private friendship must, or at least should, always give way to the stern demands of public duty.  And as the prevention of crime depends almost as much upon the rapidity as upon the certainty with which the punishment follows upon the detection of the offence, the judge who improperly retards the execution of the sentence of the law after the accused has been rightfully and legally convicted of the offence, does nearly as great an injury to the public as one who screens him from punishment altogether.

Having therefore arrived at the conclusion that there is no probable cause for supposing that there is any error in the judgment in this cause, or any reason to doubt that the prisoner has been properly convicted, if the jury came to a correct conclusion upon the questions of fact which it belonged to them exclusively to decide, I must do as the justices of the Supreme Court have done, refuse to allow this writ of error.